SUCCESSION OF FRANKLIN—ADELICIA ACKLEN, and her minor child EMMA, v. J. W. FRANKLIN et al. trustees, &c.

Depositions will not be rejected, on the ground that the cross questions were not answered,—where the cross questions were irrelevant to the issue, and of such a character as would have justified the district judge in erasing them from the records of his court. *Rost*, J.

The domicil of origin continues until another is acquired, *animo et facto*. He who seeks to establish that another has changed his domicil, must prove it by express and positive evidence; so long as any reasonable doubt remains, the legal presumption is, that the domicil has not been changed. *Rost*, J.

The law which fixes the domicil of a person at the place where his principal establishment is situated, means the principal domestic establishment; not that where he may have the largest portion of his fortune. *Rost*, J.

Intention to reside, coupled with occasional residence of a few days in each year, is sufficient to continue the original domicil. *Rost*, J.

The testator, a citizen of Tennessee, conveyed immovable property, situated in Louisiana, to his brothers, forever, in trust; the revenues to be employed in establishing and maintaining an academy in Tennessee, as particularly set forth in the will. He directed also that, after the death of his brothers, (the trustees,) the trusts should be continued, and pass over forever in the heirs of his said brothers, to pass the estate; and that the magistrates of the county court of the county of Sumner and State of Tennessee, and their successors in office, should be thereafter the perpetual superintendents of the aforesaid seminary. *Held*: The testator's intention, in this case, was to create a perpetuity, and, as to Louisiana, a new tenure of property; that intention is a legal impossibility, and the disposition falls.

It is impossible to recognize trust estates in Louisiana, without letting in all the laws which regulate that peculiar tenure of property; and the Constitutional inhibition to the Legislature to adopt any system of foreign laws, by general reference, would be rendered nugatory, if courts of justice assumed the power to introduce those systems by piecemeal, in this insidious manner. *Rost*, J.

Under the hypothesis that the words, "in trust," in this case, should be reputed not written, the title must have vested in the original trustees in full ownership, and, if it did, the charge to preserve and return the property to other persons after them, would be such a substitution as would avoid the entire disposition. *Rost*, J.

When the words of the testamentary disposition are sufficient to vest a legal title in the legatee, and the intention of the testator to create such a title for his benefit, to the exclusion of the heirs at law, and of all other persons, is ascertained, then, in furtherance of that intention, any illegal or impossible condition the disposition may contain, is presumed to have been inserted inadvertently, and is reputed in law, not written; but, where the title, created by the will, as ascertained by the words used, and the intention of the testator, is a tenure of property which our laws do not recognize, the attempt to change the nature of it, and to convert it into a title, valid under our laws, would no longer be an interpretation of the will, but the making of a new will for the testator. *Rost*, J.

I put this case upon the principle, that, where the condition is of the essence of the title created by the bequest, and intended by the testator, so that the will cannot stand without it, if that will be one which the law does not recognize, courts of justice cannot replace it by another, and the disposition must fall. *Rost*, J.

The prohibition contained in art. 1477 C. C., has not exclusive reference to citizens of other countries; it applies to sovereign States or corporations: for corporations, legally ordained, are substituted for persons. *Rost*, J.

The prohibition to a citizen of Louisiana, to make donations *causa mortis* in favor of citizens of other States, does not conflict with 2d sec. of the 4th art. of the Federal Constitution, guaranteeing to the citizen of each State all the privileges of the citizens of the several States. *Rost*, J.

SUCCESSION OF FRANKLIN.

Therefore, where a testator bequeathed immovable property situated in Louisiana, to trustees, to be held by them for the benefit of a charity in Tennessee, where the validity of the bequest is disputed, the trustees should show that the laws of Tennessee do not prohibit similar dispositions from being made in favor of a citizen of Louisiana. *Rost*, J.

The trust, created by the testator, was not uncoupled with an interest; the trustees and their descendants, all had a direct interest in the bequest. The effect of such a bequest is not merely to create a perpetuity; it contains an indefinite series of prohibited substitutions. *Rost*, J.

A testament is a law, and the first duty of courts, in this as in other laws, is to ascertain the *mens legislatoris*; when it is once ascertained beyond reasonable doubt, it must be followed, and the disposition stands or falls, as the intention of the testator can, or cannot be carried into effect, consistently with the rules of law. *Rost*, J.

Powers given to testators by the code, are exceptions to the general law regulating the devolution of property; they are limited, both as to form and substance; and it is not enough to say, that perpetuities are not prohibited, it should be shown that they are authorized. *Rost*, J.

A trust, as attempted to be created by this will, is a right in equity, to the beneficial enjoyment of lands and slaves, of which the legal title is in another person. I am not aware of any trust estate in Louisiana, which has been recognized as a legal tenure adversely to third persons having an interest. *Eustis*, C. J.

The framers of our code never contemplated to abolish naked trusts, uncoupled with an interest, which were to be executed immediately. *Eustis*, C. J.

A man has no more power to create new, or prohibited modes, of conveying property by will, than he has by sale, or by donation *inter vivos*. Between parties, they may hold their property, by any tenure or terms they please; but, as to the establishment of titles affecting the property itself, there is no power in man, out of the law; nor has society any interest in attempting to carry into effect the conceits of the dead, to the disturbance of the rules of public order and policy which regulate the living. *Eustis*, C. J.

A marriage contracted out of the State, between persons who afterwards *come here to live, (s'y établir,)* is also subjected to the community of acquets, with respect to such property as is acquired after their arrival. C. C. art. 2370. For the true sense of the language of the code, the inquiry should be, did *Franklin* and his wife *live* in Louisiana? Were they established here? By the words of the code, we are to understand the *domestic* domicil, the true and permanent home; that domestic hearth, where the husband and wife have surrounded themselves, and their offspring, with the comforts of domestic life; and from which, when he and his wife occasionally depart, for the purposes of business, or pleasure, they do so with the intention to return. *Slidell*, J.

Where there is doubt on the question of domicil, the original home is to be considered the true home. *Slidell*, J.

The bequest, by *Franklin*, to his brothers and their heirs, forever, in trust, of certain property, the revenues to be employed in establishing and maintaining an academy, in Tennessee, to be superintended by the magistrates of Sumner county, and their successors in office, &c. &c., establishes a tenure of property unknown to the laws of Louisiana, highly inconsistent with their spirit, creating an entail, and substantially involving, in a very aggravated form, a prohibited *fidei commissum* and substitution. *Slidell*, J.

The act of 1818, added facilities for the acquisition of a residence in this State, but it did not repeal the law of 1816, on the same subject. *Preston*, J., dissenting.

A declaration, made in the manner pointed out by law, is conclusive of the will and intention to become a citizen and resident of Louisiana. *Preston*, J., dissenting.

Special legacies are not to be paid out of the portion of the forced heirs; and, where a sum is given by the husband to the wife, in lieu of her interest in his succession, it is a charge upon his general estate. *Preston*, J., dissenting.

A testator may make every disposition of his property by donations *mortis causa*, which he could make by donations *inter vivos*. Unless the law prohibits a testamentary disposition, the testator may make it, if it do not violate some rule of morality or duty. *Preston*, J., dissenting.

There is, in our code, but a single restriction upon dispositions in favor of a stranger, and that is, where the laws of his country prohibit similar dispositions from being made, in favor of a citizen of this State. Art. 1477. There is no prohibition, of a disposition in favor of a foreign State, or corporation created by it. *Preston*, J., dissenting.

If article 1477 of our code, was intended, by way of retaliation, to prohibit our citizens from making donations *mortis causa*, to citizens of Tennessee, both laws would be void, as conflicting with the 2d section of the 4th article of the Constitution of the United States, guaranteeing to the citizens of each State, the privileges of citizens of the several States. *Preston*, J., dissenting.

Where a testator is desirous of becoming the founder of a charitable or educational institution, he does so on the implied condition, that the State will ratify his benevolent intentions. If the confirmation is withheld, the will is defeated; but, if granted, it operates like the accomplishment of all suspensive conditions, whether express or implied, and has a retroactive effect. *Preston*, J., dissenting.

Legacies, in favor of corporations, do not lapse, by the incapacity of the corporation to receive, at the death of the testator; the incapacity may be removed, retroactively, by the sovereign. *Preston*, J., dissenting.

The term, substitution, embraces the ownership, and not the administration of property. It implies, that one should hold the property for another, during life, and transmit it to him at his death. It is very similar, in its effects, to the entail of the English law. To constitute a substitution, the donee must be charged to preserve the property until his death, and then return it to the substituted heir or legatee. *Franklin* did not give the third of his property to his brothers, under a charge to preserve and return it to their heirs. His brothers, and their heirs, were merely appointed to take charge of, and administer it, for the seminary of learning, in Tennessee. *Preston*, J., dissenting.

A *fidei commissum* is created, where property is given to one, for another, to vest in the latter, immediately, at a given period, or upon a condition. The will does not contain a *fidei commissum*, because the property was not given by *Franklin* to his brothers, for the literary institution, but was given to the institution itself; and, the title remained in the succession of *Franklin*, until the seminary was incorporated. *Preston*, J., dissenting.

Article 1507 of the Civil Code, when adopted in the code of 1808, was not intended to introduce new principles of law into Louisiana, but merely to recognize the existing law; and no other than substitutions, and *fidei commissa, previously unlawful*, were prohibited by it. *Preston*, J., dissenting.

Substitutions, which changed the order of descents, and fostered pride and laziness, and, abstracted property from commerce; and, *fidei commissa*, by which one held property for another, who was incapable of receiving, or for an unlawful purpose, which were prohibited by the law of Spain, in force in 1808, were the substitutions, and *fidei commissa*, which the jurisconsults, who framed the code, declared *are*, and *remain*, prohibited. *Preston*, J., dissenting.

APPEAL from the District Court of West Feliciana. *Stirling*, J. *W. W. King*, for plaintiffs.

*Benjamin* and *Micou*, for plaintiffs, maintained:—In all civilized countries, it has been found indispensable to check by legislation, the unlimited disposal of property by will. The passion for acquisition of property is so strong, the tenacity with which it is preserved is so great, the reluctance with which it is abandoned by its possessor, even when on the brink of the grave, is so unconquerable, that the propensity of mankind to continue their control over property, even after death, requires the restraint of the most vigorous legislation. In Louisiana, the policy of the State, on this subject, has been uniform: the enactment of the law-giver, and the jurisprudence of the courts, have concurred from the very origin of our State government, in vindicating and maintaining this policy. The grounds on which it rests, are perfectly familiar. It is against public policy, that any individual should be allowed to intervert the order of inheritance established by the general law, and to create a special or exceptional order for his own property. It is against public policy, that estates be tied up in perpetuity, be rendered inalienable or be in any manner withdrawn from commerce. It is against the public policy of the State, that the tenures of title by which property is held, be rendered complex, thereby giving rise to litigation, to difficulties and embarrassments, and to the long train of disastrous results, which ensue when the titles to property cease to be clear, simple, and intelligible to the ordinary understanding of mankind. It is against public policy, that the elements of the ownership of property be decomposed; that the legal title be vested in one, and the beneficiary interest in another, whereby it almost invariably occurs, that improvement is checked, waste lands remain uncultivated, and vacant lots continue unimproved and untenanted.

SUCCESSION OF FRANKLIN.

SUCCESSION OF    In all the changes that our judiciary has undergone, the jurisprudence of the
FRANKLIN.    State, on this subject, has been maintained by one unbroken series of decisions.

In the case of *Mathurin* v. *Livaudais*, 5 N. S. 302, Judge Porter, in deliver-
ing the opinion of the court, declared, that "our code abolishes substitutions
and *fidei commissa*. The object of this change in our jurisprudence was, as it
is well known, to prevent property from being tied up for a length of time in the
hands of individuals and placed out of the reach of commerce."

In the *Heirs of Cole et al.* v. *Cole's Executors*, 7 N. S. 416, the same judge,
again the organ of the court, observes, "It is necessary to check the power of
the citizen over his property after his decease; for the strong desire in man-
kind to perpetuate their authority, over what they have acquired, would other-
wise induce them to place it for a length of time, and forever, if they could, out
of the reach of alienation."

In *Arnaud* v. *Tarbe et al.*, 4 L. R. 502, Judge Matthews declared, that
"the policy of our law in prohibiting substitutions, is founded on reasons of
public convenience and utility; to preserve the order of successions uniform,
to prevent the confusion, difficulties and uncertainties of titles to property held
under entails, and to leave it free for the purposes of commerce."

In *Harper* v. *Stansborough*, 2 Ann. 381, Eustis, C. J. says, "It is the attri-
bute of every government, to establish and regulate such modification of the
rights of property in things within its jurisdiction, as the public interest requires.
Testamentary substitutions are prohibited in this State. The prohibition is
established in the interest of public order and state policy. They have always
been held null by our courts, the nullity being of that character which is abso-
lute and irremediable." And again, "the modifications of the rights of pro-
perty under our laws are few and easily understood, and answer all the purpo-
ses of reasonable use. It is incumbent on courts to maintain them in their
simplicity."

In the case of the *Heirs of Henderson* v. *Ross*, 5 Ann. 441, Judge Slidell
decided, "that an attempt by a testator to perpetuate his succession, is in viola-
tion of the policy of the law: that the spirit of the law, abolishing substitutions
and *fidei commissa*, is to prevent property being tied up and out of the reach
of commerce. That if such bequests be unlawful, *à fortiori*, is it unlawful to
tie up property in the hands of executors and commissioners forever." And
in *Roy* v. *Latiolas*, 5 Ann. 557, Judge Preston quotes, with high eulogy, and
affirms the principles recognized and maintained by Judge Matthews, in *Arnaud*
v. *Tarbe* already quoted.

If, after this rapid review of the decisions that are declaratory of the general
principles which govern the subject, we refer to the positive legislation of the
State, we find that the chapter of our code, which treats of such bequests, is
entitled "of dispositions reprobated by law in donations *inter vivos* and *mortis
causa*." There are but four articles in the chapter; they read thus: Art.
1506 : In all dispositions *inter vivos* and *mortis causa*, impossible conditions,
those which are contrary to law or to morals, are reputed not written. Art.
1507 : Substitutions and *fidei commissa* are and remain prohibited. Every dis-
position by which the donee, the heir, or the legatee is charged to preserve for, or
return a thing to a third person, is null, even with regard to the donee, the
instituted heir, or the legatee.

In consequence of this article, the trebellianic portion of the civil law, that is
to say, the portion of the property of the testator, which the instituted heir
had a right to retain when he was charged with a *fidei commissum* or a fiduciary
bequest, is no longer a part of our law.

Article 1508 : The disposition by which a third person is called to take the
gift, the inheritance or the legacy, in case the donee, the heir, or the legatee
does not take it, shall not be considered a substitution and shall be valid. Art.
1509 : The same shall be observed as to the disposition *inter vivos* or *mortis
causa*, by which the usufruct is given to one, and the naked property to another.

In connection with these articles, it may not be improper for us to call atten-
tion to the terms of one or two other articles of our code, declaratory of well
known general principles, which will find constant application in the progress of
the argument.

Article 9 : The law is obligatory upon all inhabitants of the State, indiscrimi-
nately; the foreigner, whilst residing there, and his property, within its limits,
are subject to it. Art. 12 : Whatever is done in contravention of a prohibitory
law, is void, although the nullity be not formally directed.

With these general principles kept constantly in view, as the lamps which are <span style="font-variant: small-caps;">Succession of Franklin.</span> to guide our path, we now proceed to the examination and analysis of those provisions of *Franklin's* will, which, according to our view of the law, are null and void.

The testator, after making a disposal in favor of his wife of certain revenues, &c., and bequeathing to his children that portion of his estate, which he was by law forbidden to dispose of, to their prejudice, makes the following devise:

" 8th Item.  I give and bequeath all my property, real and personal, of whatever kind or nature, that is situated in the States of Tennessee and Misssissippi, or any other common law States, where trust estates can be created, together with my bank stocks and effects and credits, and an undivided one-third part of all my said property, movable and immovable, slaves, &c., that is situated, lying and being in said State of Louisiana, and also the rest and residue of my estate, wherever situated, in trust, to my two brothers, *James* and *William Franklin*, of Sumner county aforesaid, for the following purposes, to wit: the revenues arising from said property, bank stock, and such money, funds or credits due me, as may remain after the payment of the several devises and legacies, annuities, increase and ameliorations of my said plantations in Louisiana and other purposes as directed by this will, together with the revenues arising from my plantations in Tennessee and other property in Tennessee and Mississippi, and other common law States, together with the dividends of my bank stock, and interest on money and notes due me, and the revenues of the one-third of all my property, situated in the State of Louisiana, after the payment of said several devises, &c., to be laid out in building, proper and suitable edifices on my said Fairview plantation, in the county of Sumner and State of Tennessee, for an academy or seminary, the furnishing the same with fixtures and furniture, and the employment and payment of such teachers and professors, male and female, as may be considered necessary by my said trustees, for the education, board and clothing of the children of my brothers and sisters and their descendants, in the best and most suitable and proper manner for American youths, having a particular regard to a substantial and good English education, and such other higher and ornamental branches as the aforesaid revenues, &c., will enable my said trustees to accomplish, and if the revenues, &c., should be sufficient therefor.  I also wish that the poor children in said county of Sumner, of unexceptionable character, and such as my said trustees may select, should likewise be educated and supported during the time at the same seminary.  And after the death of my aforesaid brothers, it is my will and desire, that the aforesaid trusts be continued and pass over forever in the heirs of my said brothers, to pass the estate, and that the magistrates of the county court of said county of Sumner and State of Tennessee, and their successors in office, be thereafter the perpetual superintendents of the aforesaid seminary, to see that my intentions be fully carried into effect."

It really seems, that this bequest comes so clearly within the prohibition of our law, and is so utterly opposed to the public policy of the State, that no argument can make the proposition any plainer, and we would at once leave this branch of the case without further comment, if our respect for the eminent counsel opposed to us, did not render imperative the duty of a serious response to the positions assumed by them, and urged with so much apparent conviction on the court.  We will, therefore, proceed to sketch rapidly the features, that distinguish the different classes of substitutions and *fidei commissa*, so that we may be readily able to ascertain the proper denomination of the devise in question.  In doing this, we shall spare the court any display of industry or learning, by quoting the various authorities on this most subtle and intricate branch of the civil law, and shall confine ourselves to stating the results of our study, so far as may be necessary in elucidation of the particular provision now under discussion.  We understand all the authorities as agreeing, at least, on the following propositions:

Substitutions are of two kinds; the vulgar substitution of the Roman law, being that which is defined in art. 1508 of our code, already quoted, and is not prohibited ; and the substitution, properly so called, equivalent in its nature to the common law entail, by which the donor or testator undertakes to establish the manner in which the property shall descend, on the death of the donee or legatee, and by which the donee or legatee is prohibited from so disposing of the property as to affect the order of inheritance or descent, thus established by the donor or testator

*Fidei commissa* are of three kinds : they are all included in what are denominated trusts, in equity jurisprudence.

The first is the naked trust, uncoupled with an interest, to be executed immediately. These, when not intended to vest title in the trustee, are not prohibited, as not being in contravention of the policy of our State, and as being rather mandates than bequests. An example is found in the bequest of a sum of money to a person to purchase the freedom of a slave, on whom the testator wishes to confer the gift of liberty. Such was the case of *Mathurin* v. *Livaudais*, 5 N. S. 302.

The second is termed by the civilians, the *fidei commissum de eo quod supererit*: that is to say, the gift or bequest of property to A, without any obligation on his part to preserve it, nor prohibition to alienate it, but on condition, that " what may remain" at his death, shall descend to certain persons indicated by the donor. In such *fidei commissa* as these, the gift is good as to the donee, but the reversion in favor of the third person, is null, because by the very terms of the art. 1507, it is only when the donee is "charged to preserve for, or return a thing to a third person," that the disposition is null, even with regard to the donee. Examples of this class of *fidei commissa*, are frequent in our reports. See the cases of *Bernard's heirs* v. *Soulé*, 18 L. R. 24, and *Beaulieu* v. *Ternoir*, 5 Ann. 480.

The third class is that which includes in the bequest to an individual, the duty or trust that he shall not alienate the property, but shall preserve it for, or return it to a third person, either at the death of the donee, or at some distant period from the date of his receiving the property given or bequeathed. This *fidei commissum* is utterly null and void, even as to the donee, as established by art. 1507.

Let us then test the bequest of *Isaac Franklin*, and ascertain the extent to which it attempts to carry out purposes " reprobated" by our law, in order to determine whether it is to be executed in whole or in part, or be set aside entirely.

The testator declares, that he gives the property in question, "in trust to his two brothers, *James* and *William Franklin.*" What is the nature of their title ? This question becomes necessary, because however self-evident the answer would seem to the lawyer of any of our sister States, the conveyance in trust is unknown to the civil law. Our code, in treating of ownership, divides it into perfect and imperfect ownership ; and it defines perfect ownership to be that which is perpetual, and which is not incumbered with any charge towards any other person than the owner.

A trust estate is therefore clearly not a perfect ownership.

Ownership is imperfect when it is to terminate at a certain time, or on a condition, or if the thing which is the subject of it, being an immovable, is charged with any real right toward a third person as an usufruct. When an immovable is subject to an usufruct, the owner of it is said to possess the mere ownership. C. C. art. 482.

Absolute ownership gives the right to enjoy or to dispose of one's property in the most unlimited manner, provided it is not used in a way prohibited by laws or ordinances.

Persons who reside out of the State, cannot dispose of the property they posses here, in a manner different from that prescribed by its laws. C. C. art. 483.

Usufruct is the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility, and advantages which it may produce, provided it be without altering the substance of the thing. C. C. art. 525.

A comparison of these articles of our code, with the provisions of the will, demonstrate conclusively, that the bequest to *James* and *William Franklin*, is a devise of the mere ownership, and that the usufruct or fruits and revenues of the property are bequeathed to the children of the testator's brothers and sisters and their descendants, or, in other words, to the seminary which has been incorporated by the State of Tennessee, under the name of the Isaac Franklin Institute.

As this devise thus decomposes the perfect ownership of the property into its two constituent elements, and leaves the naked title or mere ownership to one devisee, and the usufruct or beneficiary interest to another, it is necessary to examine the character of each of these two bequests, in order to ascertain whether they are substitutions.

Upon this point, the words of the testator are too clear to admit of doubt or cavil. In bequeathing the naked title to his brothers, he specially prohibits their alienation of it, for he provides that: "after the death of my aforesaid brothers, it is my will and desire, that the aforesaid trust be continued and pass over forever in the heirs of my said brothers, to pass the estate." Here then is an entail that is never to be cut off, a property that is never to be alienated, a substitution in its most offensive form, not only tying up the property out of the reach of commerce, but doing this in the hands of persons who have no interest in its improvement, who are not to reap any of its fruits, who are not provided with the means of effecting ameliorations of any kind whatever, because they are vested with no right to, nor control over the revenues, beyond the employment of them in the support of the seminary. Lewin on Trusts, 138, 24 Law Lib. Lewis on Perpetuities, 592, 52 Law Lib.

How stands the case with regard to the devise of the usufruct or revenues? They are left for the "education, board and clothing of the children of my brothers and sisters, and their descendants, as well as my own children and their descendants;" and the magistrates of the county court of Sumner county and their successors in office, are to be the perpetual superintendents of the seminary.

Now the art. 601 of our code, declares, that "the right to the usufruct expires at the death of the usufructuary." So that, if this devise were perfectly unexceptionable on other grounds, it could by no possibility be extended beyond the children of *Isaac Franklin's* brothers and sisters in life, at the date of his death; and as it is only granted for their education, board and clothing, whilst pursuing their studies, the whole purpose of the testator, as far as he would be allowed by law to accomplish it, would be already effected, or nearly so; at this moment, and as the property in Tennessee is more than sufficient for this, the only purpose legally feasible, it would follow, that no effect could be given to this provision of the will as regards the Louisiana property. But the exigencies of our case do not require that we should assume this narrow ground. The clear intent of the testator is, to entail on the children and descendants of himself and of his brothers and sisters, the revenues of this property forever.

There is scarcely a single object of public policy enumerated in the decisions of our judges, which is not contravened in this bequest.

It places property out of the reach of commerce forever. It separates the naked title from the usufruct forever. It conveys the property to the two brothers, in trust, that they shall preserve it and return it to their heirs, in direct violation of the 1507th article of the code. It places the property beyond the reach of improvement forever. It creates new tenures of property unknown to our law, which does not recognize nor make provision for trust estates. It complicates and embarrasses titles to property; having reference to laws foreign to our jurisprudence, the title conveyed by it, can only be understood by recurring to those laws: it therefore introduces, as regards this particular property, the entire system of the equity jurisprudence of our sister States in relation to trusts, although by our State Constitution, the Legislature is expressly forbidden to introduce that system, or any other system of foreign laws into this State.

Indeed, no provision in a will has ever come to our knowledge more objectionable in its every feature; and, if the court considers that, in the case of *Clague's Widow* v. *His Executors*, 13 L. R. 7, a former bench annulled a clause in a will, which provided that the property of the testator should remain in the hands of his executors, to be delivered to his children at their majority, on the ground that it was a *fidei commissum*, it is difficult to conceive what possible argument can be advanced to support a devise in which the property is never to be given up at all, but forever to be held and administered for the benefit of others than those who are vested with the title.

We refer the court to the following authorities on the question of domicil and community. As regards substitutions and *fidei commissa*, the numerous briefs recently submitted to the court, contain all that can be required, and we deem it useless to copy them. On domicil and community: C. C. 2370; 42 *et seq. Hennen* v. *Hennen*, 12 L. R. 190. *Saul* v. *His Creditors*, 5 N. S. 580. *Tourné* v. *Tourné*, 9 L. R. 457. *Cole's Widow* v. *Executors*, 7 N. S. 42. *Cole* v. *Lucas*, 2 Ann. 950. *Ricard* v. *Kimball*, 5 R. R. 142. *Nelson* v. *Botts*, 16 L. R. 596. *Williams* v. *Henderson*, 18 L. R. 557. *State*

v. *Probate Judge,* 2 R. R. 449. *Davis* v. *Binion,* 5 Ann. 248. *Magee* v. *Brown,*
4 Ann. 186.    *Waller* v. *Lea,* 8 L. R. 215.    *Tanner* v. *King,* 11 L. R. 175.
*Case* v. *Clark,* 5 Mason, 70.    *Jennison* v. *Hapgood,* 10 Pick. 77.    *Hill* and
*McLean* v. *Spangenberg,* 4 Ann. 553.    *Judson* v. *Lathrop,* 1 Ann. 79.    Story's
Conflict of Laws, §§ 44, 47.

*C. Roselius,* for defendant.  1. The first and most important question is,·
whether the bequest for the establishment and endowment of the seminary or
academy, is valid or not ?

The objection to its validity is, that it contains a substitution and *fidei
commissum.*

The reasons which induced the learned judge of the district court to sustain
this objection are, "that the provisions of the will referred to, even if they do
not contain a substitution, or *fidei commissum,* in the technical sense of those
terms, yet tie up the property of the testator in such a manner, as to place it
beyond the reach of commerce, and therefore equally reprobated by law, and
opposed to the public policy of the State."

This argument, if argument it can be called, takes for granted, that a testator
can, by a disposition of his will, take property out of commerce.    But the fallacy
of this assumption must be obvious to every legal mind.    Things, which are
naturally susceptible of private ownership, can only be taken out of commerce
by an act of sovereignty ; hence, every attempt, by a testator, to take the property
of his succession out of commerce, is an impossible condition, and must be
reputed as not written.    C. C. 1506.    N. C. 900.    13 L. R. 7.    12 R. R. 549.
3 Marcadé, No. 485. 5 Toullier, Nos. 241 to 269.    6 Toullier, No. 488.    8
Duranton, Nos.  96 to 111. 9 Duranton, No. 314.    3 Zachariæ, No. 692.  Coin
Deslile, pp. 69 and 70.  1 Grenier, No. 149.    11 Locré, p 7.  Journal du Palais
for 1807, vol. 6, p. 221 ; for 1835, vol. 27, p. 38 and p. 1159 ; for 1841, vol. 37,
p. 353 ; for 1842, p. 646.  Pandects, b. 28, t. 7, l. 1, and same book, t. 14, l. 9
and 14.    Institutes, b. 2, t. 14, l. 10.    Partidas 6, t. 3, l. 3.  See also the  clear
and conclusive argument of the French jurists on this question, in the *McDonogh*
will case.

There is only one illegal condition that will affect the validity of the bequest in
which it is inserted.  " Every disposition, by which the donee, the heir, or
legatee, is charged to procure for, and to return a thing to a third person, is null,
even with regard to the  donee, the instituted heir, or the legatee."   All other
illegal or impossible conditions, I repeat, are reputed as not written.   The dis-
tinction between a prohibited substitution and a *fidei commissum* was well
explained by this court in the cases of *Ducloslange* v. *Ross,* 3 Ann. 432 ; and
*Beaulieu* v. *Ternoir,* 5 Ann. 476.

But, let me ask, on what ground can it be pretended, that there is either a
substitution, or a *fidei commissum,* in the will of *Isaac Franklin ?*  Can any
candid mind deny that *Isaac Franklin* intended to establish and endow an
academy or seminary ?  He does not leave his property to his brothers and
trustees, but to the institution which he intended to create.   He availed himself
of their agency, to carry  his intentions into effect immediately after his death,
without waiting for the slow and tardy action of the government to give a cor-
porate existence to the educational institution, which was the object of his
solicitude.

It is contended, by the learned counsel for *Mrs. Acklen,* that a bequest for
the establishment and endowment of an  academy, is reprobated by our law,
and they cite quite a number of authorities to support this startling position.
The bare statement of the proposition carries with it its own refutation ; and the
authorities referred to, do not give the remotest countenance to it.

2. Where was the matrimonial domicil of *Franklin* and his wife ?

No doubt, in the majority of cases, the domicil and residence of a person are
in the same place ; but it does by no means follow that they are convertible
terms.   The parliament of Paris decided, on the 8th June, 1742, that a certain
*Carangeau,* who was born in Paris, and died in Brittany, after having resided
sixty-four years in the latter place as superintendent of fortifications, had
preserved his domicil in Paris, because he had done no act from which an
intention to change his domicil could be inferred.   This decision is reported by
Dénisart *verbo* Domicile, No. 33.

What is understood by domicil ?

Article 42 of the code defines or describes it as follows :  "The domicil of
each citizen is in the parish wherein his principal establishment is selected.  The

principal establishment is that in which he makes his habitual residence; if he <span style="float:right">Succession of Franklin.</span> resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereinafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected."

This is but an imperfect translation of the Roman law: "Et in eodem loco singulos habere domicilium, non ambigitur, ubi quis larem, rerumque ac fortunarum summum constituit, unde rursus non sit discessurus, si nihil avocet: unde cum profectus est, peregrinari videtur: quod si rediit, perigrinari jam destitit. C. l. 10, t. 39, l. 7."

Which may be translated as follows: "There is no doubt that every person has his domicil in that place where he has his domestic hearth, the principal part of his property, business and fortune; whence he does not wish to depart, unless called away by business, and is a wanderer when he has left it, but ceases to be so on his return to it."

The difficulty in the translation of the Latin text of this law into English, consists in finding an equivalent expression for the word *larem*, which has several meanings. In the glossary it is thus explained: "Animum habitandi perpetuo, et habitet; nam facto opus est, et hoc etiamsi non habet ibi majorem partem rerum." I have paraphrased it by the words "domestic hearth," as more literal, but, there is no doubt, that the sense of the original would be more fully expressed by using the very significant expression "homestead," that is to say, the place where all the conveniences and comforts of life are gathered together.

Facciolati's definition seems to be in uniformity with this idea, "Domicilium, domus, sides domestica, habitatio certa et diuturna."

Judge Story says, "two things then must concur to constitute a domicil: first, residence; and secondly, the intention of making it the home of the party." There must be the fact and the intent; for, as Pothier has truly observed, a person cannot establish a domicil in a place, except it be *animo et facto*. Voet emphatically says, "Illud certum est, neque solo animo atque destinatione patris familias, aut contestatione solâ, sinè re et facto, domicilium constitui; neque solâ domus comparatione in aliquâ regione; neque solâ habitatione, sine proposito illic perpetuo morandi." So D'Argentré says, "Quamobrem, qui figendi ejus animum non habent, sed usus, necessitatis, aut negatiationis causa alicubi sint, protinus a negotio discessiori, domicilium nullo temporis spatio constituent; cum neque animus sinè facto, neque factum sinè animo ad id sufficiat." Conflict of Laws.

It is obvious, therefore, that residence alone cannot constitute a domicil; for residence consists in the mere fact of inhabiting a place.

Domicil, says Marcadé, is the legal or judicial location of the person; it is an ideal or moral thing created by the law, which indicates the relation existing between the person and a certain spot of earth. In common parlance, however, we are in the habit of calling domicil the house or place where the juridical location is fixed. But that is not the technical sense of the word. The language of the code is: "The domicil of each citizen is in the parish wherein his principal establishment is selected." It is not the establishment or house itself, but at the establishment or house.

The code speaks of civil domicil alone; the political domicil of each citizen is at the place where he exercises his political rights. This kind of domicil is determined by the Constitution and laws of the State, and is not necessarily in the parish, or even State, of the civil domicil.

Domicil may be of three sorts: domicil by birth, *domicilium originis*; domicil by choice, *domicilium proprio motu*; and domicil by the operation of law, as that produced by marriage, minority, &c.

The question of domicil, says Merlin, is frequently not of easy solution; many persons have several establishments at the same time, at different places; they remain six months at one place, and six months at another; return to the first and again go to the second, without any indication where they have selected their domicil. When the facts leave the question doubtful, the domicil of birth is to be preferred, for, as long as there is not clear proof that a person has severed those ties which attach him to the place of his nativity, it is presumed that the true domicil has always continued there. Merlin Rep. *verbo* Domicil, § 1 and 2.

According to the code, it would seem that a party may have two domicils at the same time: "If he resides alternately in several places, and nearly as much

SUCCESSION OF in one as in another, and has not declared his intention, in the manner herein-
FRANKLIN. after prescribed, any one of said places where he resides, may be considered as
his principal establishment, at the option of the person whose interests are
thereby affected."

If the operation of the rule here laid down, is to be limited so as only to regu-
late the right of bringing a suit, or giving legal notices, etc., at either of the resi-
dences of such a person, it is no doubt a salutary provision; but, if an attempt is
made to extend it to the question of domicil, raised in this litigation, between
*Mrs. Acklen* and the "Isaac Franklin Institute," it is an absurdity; for each of
the contending parties would, of course, choose the domicil of *Franklin* and his
wife, in the State most favorable to his interest.

It is clear, therefore, that although a person may have several residences at
the same time, he can not have more than one domicil, properly speaking.

In order to subject a party to a particular tribunal, it has always been con-
sidered sufficient to show, that he has an apparent domicil, or rather residence,
within the territorial limits of the court. But a very different rule obtains
when the right of inheritance, or the question of community, depends on the
fact of civil domicil. Merlin establishes this difference in the clearest manner.
Rep. *verbo* Delinatoire, § 1.

Actual residence is not required to retain a domicil once acquired; it may be
retained *animo solo;* and this intention to retain it is always presumed, until
the contrary is made manifest by the *animo et facto* which must unite to change
the former, and to acquire a new domicil.

Our reports abound with cases, in which the question of domicil has pre-
sented itself, in its various phases.

In the case of *Tanner* v. *King,* 11 L. R. 178, the Supreme Court says: A
man's domicil is his house where he establishes his household, and surrounds
himself with the apparatus and comforts of life. Though he departs for a season,
it is always his intention to return. When once fixed, it will continue until the
contrary be affirmatively shown.

The decision in the case of *Hennen* v. *Hennen,* 12 L. R. 190, is clearly
erroneous.

The true principle applicable to the subject was recognized in the case of
*Gravillon* v. *Richards' Executors et al.,* 13 L. R. 297, in which Mr. Justice
Eustis says: "The fact of a person remaining in a foreign country, without any
intention of establishing himself there, does not operate a change of his domicil;
but as soon as the will of making a permanent establishment in the country is
combined with the fact of his residence, the residence, even for a few days, fixes
the domicil."

But, in the case of *Boone* v. *Savage,* 14 L. R. the court confounded the civil
with the political domicil. The judge, who was the organ of the court, observes:
"The articles 42 and 43 of the Louisiana Code, referred to, only provide for
cases of a change of domicil, by persons already residents of the State. The
present case is that of a person, resident in another State, attempting to acquire
a residence here. On this subject a law was passed in 1816. See Moreau's
Dig. *verbo* 'Residence,' 308. It declares that, a 'residence within the State
shall not be considered as acquired, until the individual, coming into the State,
shall have remained within the same twelve months following the date of his
notice to the judge, etc.' And a second act, passed in 1818, (2 Moreau's Digest,
309,) alters, in some respects, the previous requisites, but still requires a resi-
dence of one year.

"It is already seen that the defendant's declaration was made in December,
1837, and this suit was instituted in April following. If we take the law of 1818
for our guide, still the residence of one year is not shown."

But it is obvious that the laws of 1816 and 1818 have nothing whatever to do
with the subject. Those laws evidently refer to political residence, and can
have no application to civil domicil. To invoke these laws for the purpose of
deciding a question of civil domicil, leads to the most absurd and preposterous
results. The court decides that it requires a residence of one year in the State,
by persons coming from another State, to acquire a domicil. Until the expira-
tion of that period, they are liable to be sued by attachment as non-residents.
But the same law provides, (section 3,) that residence once acquired shall not
be forfeited by absence on the business of the State, or of the United States, but
by a voluntary absence from this State for two years, or the acquisition of a

residence in any of the other States of this Union, shall forfeit a residence within this State." Thus, then, it follows as a matter of course, by the same process of reasoning, that no attachment will lie against a party who has acquired a residence until after the expiration of two years, to be counted from the day he has voluntarily absented himself from the State, or until he has acquired a new residence in another State of the Union. No doubt the attachment, after such a lapse of time, would be of great benefit to the suing creditor! This is not all : during the same period of time, a citation may be served at the residence of the party, and a judgment may be rendered against him, as if he were present, although in point of fact he may be in France, Germany, China, Russia, or some other distant country! No curator can be appointed to him as an absentee, because, in contemplation of law, he is present. It is said that the articles 42 and 43 only provide for a change of domicil, by persons already residents of the State ; but the learned judge who prepared the opinion, seems to have forgotten that these articles of the code contain no new principles, but are only enunciative of the doctrine of domicil, as old as the law itself. Suppose the code had been silent on the subject, would the same rules not have been applied to the decision of the question of domicil ? And what possible difference can it make whether the party acquiring a domicil in the parish of Orleans, for instance, comes here from Caddo, or from Kamschatka ? The question is always the same with regard to the elements required to constitute a domicil ; it is always *animo et facto.* But it is clear that the laws of 1816 and 1818, refer exclusively to political residence ; they were passed in pursuance of the 12th section of the Constitution of the State, which provides, that : " The Legislature shall point out the manner in which a man coming into the country shall declare his residence."

This view of the subject is fortified by the 2d section of the act of 1818, which provides, that : " No alien shall be considered as having acquired all the rights of a citizen of this State, and enjoy the rights of suffrage until, in addition to the requisitions contained in the foregoing section, they shall have acquired a naturalization under the laws of the United States, and become a naturalized citizen of the United States. Provided, however, that this shall not be required of any individual who was a resident of this State, at the time of the adoption of the Constitution of this State.

In the case of the *State* v. *the Judge of the Court of Probates of New Orleans*, 2 R. R. 449, the same blunder was committed.

The organ of the court says : "The question then is, Where is the domicil of *R. L. Tilghman ?* The Civil Code, articles 44 and 45, says, that where there is no express declaration as to domicil, the proof of intention depends upon circumstances. This court, in *Gravillon* v. *Richards' Executors et al.*, 13 L. R. 297, said, as soon as the will of making a permanent establishment in the country is combined with the fact of his residence, the residence, even for a few days, fixes the domicil." This was, perhaps, pressing the principle of domicil too far. The subject was again considered in 14 L. R. 169, when it was held that it required an uninterrupted residence of one year in one of the parishes of the State, to acquire a domicil, and until then a party may be sued by attachment as against a non-resident. The provisions of the acts of the Legislature, passed in 1816 and 1818, are plain. The first section of the latter act says, that there must be a residence of " one year without interruption," in one of the parishes of the State, the party having, in the mean time, purchased or rented a house or room, or parcel of land, or pursued some profession or employment for a support. *Bullard* and *Curry's* Dig. 286, 287, sec. 1 and 2. The letter of the law is too clear to be misunderstood ; and it seems to have been made to operate on that description of persons who come to our State for purposes of their own, and never identify themselves with our interests and institutions.

Shortly after the organization of the present judiciary, the subject came up for decision, in a number of cases, and the correct doctrine was invariably applied.

In the case of *Judson* v. *Lathrop*, 1 Ann. 78, it was held, " that where a party resides alternately in different parishes, the judicial declaration governs, when the residences appear to be nearly of the same nature, *si sa résidence dans chacune est à peu près la même.* See, also, *Cole* v. *Lucas*, 2 Ann., 950. *McGehee* v. *Brown*, 4 Ann. 186. *Hill* v. *Spangenberg*, 4 Ann. 554.

A man's old domicil, says the court in the case of *Favrot* v. *Delle Piane*, 4 Ann. 586, can only be changed by the adoption of a new one *animo et facto.*

SUCCESSION OF
FRANKLIN.

Upon a question of domicil, the declarations of a party in an authentic act are admissible against him, but he is not concluded by such declarations, and may disprove them. *Davis* v. *Binion*, 5 Ann. 248.

While the suit for the partition was pending, and ready for trial, *Mrs. Acklen* applied for and obtained an order putting her in possession of all the property for the partition of which the parties were then before the court. From this decree a separate appeal was taken, which may as well be disposed of with the present case, for it is, in fact, only an incident in the main action. The judgment of the district court, on this branch of the case, is so palpably erroneous, that I deem it useless to do more than to state the fact that such a judgment was rendered.

*John L. Lobdell*, for defendant. The counsel refers the court to the following authorities on the points raised and argued in this case, to wit:

1st. Citizenship. 9 M. R. 491; 11 do. 440; 4 do. N S. 51; 5 do. 571 to 599; 6 do. 76; 7 do. 44. 8 L. R. 43, 213, 555; 11 do. 175; 12 do. 190; 13 do. 293; 14 do. 169; 16 do. 596; 17 do. 589; 18 do. 557, 563. 2 R. R. 449; 3 do. 243; 5 do. 142; 6 do. 192; 8 do. 106; 9 do. 348; 12 do. 334. 1 Ann. 78; 2 do. 946. Bullard and Curry's Digest, p. 286, secs. 1 and 2; p. 287, secs. 3, 4, 5. Civil Code, arts. 10, 42, 43, 44, 45, 77, 175, 929, 1130, 2270. Code of Practice, arts. 164, 166, 167, 168, 1022.

2d. The Notarial Acts, Renunciation, Community, &c. 10 M. R. pp. 577, 571; 12 do. 114; 3 do N. S. 626; 4 do. 543; 5 do. 257, 260, 361, 634; 6 do. 139, 207, 325. 2 L. R. 214, 565; 3 do. 29, 479; 4 do. 190, 191, 316, 461; 5 do. 113, 126, 395; 6 do. 105, 185, 500; 7 do. 17, 42, 156, 216, 226, 292: 8 do. 489; 9 do. 254; 10 do. 291, 453, 580; 11 do. 70, 176, 374; 12 do. 105, 539; 14 do. 523. 1 R. R. pp. 86, 378; 2 do. 182; 3 do. 171; 4 do. 71, 128, 208, 207, 290, 335, 397; 5 do. 299, 475; 7 do. 398, 406, 418; 9 do. 3, 438. 2 Ann. 30, 226, 259, 575, 762. Civil Code, arts. 1, 10, 42, 484, 1315, 1724, 1755, 1761, 1767, 1791, 1792, 1797, 1815 to 1820, 1840, 1854, 1875, 1876, 1887. Acts of Legislature of Louisiana, 25th March, 1844, p. 99.

3d. The validity of the bequest and devise to the Seminary. 6 R. R. 235; 7 do. 146, 425, 481; 8 do. 262, 414; 9 do. 438; 12 do. 334, 539. 1 Ann. 162; 2 do. 377, 580, 774, 980. Civil Code, arts. 10, 483, 1652, 1705, 1706, 1708, 1717, 1718, 1721, 1941 to 1957.

5th. Whether the residuary legatees have to pay the specific legacies, or the children and seminary *pro rata*, or the executors out of the mass of the succession, as directed by the will. 8 L. R. 43; 11 do. 220; 17 do. 312. 2 R. R. 1; 12 do. 334, 639. 2 Ann. 30.

9th. The judgments homologating the administrations of the executors, are *res judicata.* 5 Mar. N. S. 466. 6 L. R. 472. 2 R. R. 429; 9 do. 438; 12 do. 334. Civil Code, arts. 429, 430, 1230, 1347, 1360, 1369, 1373, 1374, 1376, 1379, 1480, 1489, 1491, 1492, 1600, 1601, 1603, 1604, 1606, 1607, 1619, 1626, 1627, 3522, sec. 29.

12th. The ameliorations, &c., having been made on the plantations in the parish of West Feliciana, by the executors, the partition ought to be made. 1 Mar. N. S. 324; 6 do 350. 3 L. R. 494; 3 do. 128; 4 do. 300; 5 do. 107; 7 do. 383; 16 do. 483. 5 R. R. 453; 9 do. 438; 10 do. 118. Civil Code, arts. 1214, 1215, 1216, 1217, 1218, 1219, 1223, 1224, 1246 to 1253, 1258 to 1260, 1269, 1273, 1286 to 1304. Code of Practice, arts. 1020, 1021, 1022 to 1032.

*J. A. Patterson*, attorney and under-tutor. We claim, that as the domicil of the father being in Louisiana, all the personal property of every kind and description, and wherever situated, belongs and must be distributed according to the laws of Louisiana, and refer the court to the following pages of the record for the testimony on that point: First, the declaration made and recorded in New Orleans, by *Isaac Franklin*, p. 352, and the testimony of several witnesses, proving his acts and declarations, pp. 360, 369, 384, 387, 391, 397, 401. See also the will, item 5: "At my death," he states that it is his "desire that his house servants shall be removed to Tennessee."

If the court should be of opinion, that the renunciation made by the mother of the minor is binding and valid, then we claim that the community so renounced goes absolutely to the heirs, and no part of it to the residuary legatees, as it never belonged to the deceased in his lifetime, and if renounced by his widow, must go directly to the forced heirs. 7 R. R. 430. For the validity of the renunciations, he relies on the authorities cited by the counsel of the trustees.

By the court: *(Preston*, J. dissenting.)

ROST, J. *Adelecia Acklen*, the former wife of *Isaac Franklin*, deceased, seeks to set aside, on the ground of error, various acts by which she renounced all her rights in the property composing the succession of her late husband, and claims her community rights therein, on the ground that at the time of her marriage with *Franklin*, in the State of Tennessee, in April, 1839, he was domiciliated in this State, and that the matrimonial domicil having been in Louisiana until the dissolution of the marriage, the distribution of the real estate acquired here during its continuance, and of the personal estate, wherever situated, should be according to the law of Louisiana.

The plaintiff, also, in her own right as heir of two of her children, deceased since their father, and as tutrix of *Emma Franklin*, the only surviving issue of her former marriage, seeks further to annul the universal legacy made by *Isaac Franklin*, to his brothers *James* and *William Franklin*, in trust, for a seminary of learning to be established in Sumner county, in the State of Tennessee, so far as it disposes of property in Louisiana, on the ground that the title thus created is in violation of the laws of Louisiana; that its effect would be to tie up and to place out of commerce the property bequeathed, against the policy of the State; and that if the title was otherwise valid, it would be void by reason of the substitutions and *fidei commissa* which it contains.

The under-tutor of the minor has also intervened in her behalf, claiming the nullity of the universal legacy.

The defence to these claims is, that the domicil of origin of *Isaac Franklin* was in Sumner county, State of Tennessee, that he never changed it, and no community, at any time, existed between him and his wife. That he made for her, by his will, ample provisions, which she has accepted; and that she is estopped, by her acceptance, from contesting the validity of any of its dispositions. That the acts of renunciation were signed by her, of her own free will, and with full knowledge of her legal rights.

The Franklin Institute has been incorporated by the Legislature of the State of Tennessee, with full power to receive the legacy and to carry the dispositions of the will into effect, and the trustees appointed under the act of incorporation, have made themselves parties to the record, and have joined the executors in the defence, averring the legality of the bequest in favor of *James* and *William Franklin*, of one-third of the plantations and slaves of *Isaac Franklin*, in Louisiana.

The record is voluminous, and the pleadings it contains raised many other issues in the district court, but I understand the points stated to be the only ones submitted for our decision; they were decided in the court below, in favor of *Mrs. Acklen* and her minor child. The executor and the trustees of the Franklin Institute have appealed from the judgment.

Article 2369 of the Civil Code provides, that every marriage contracted in this State, superinduces, of right, a community of acquets and gains, if there be no stipulation to the contrary.

The marriage, in this case, was not contracted in this State; it did not, therefore, superinduce of right a community of acquets and gains, and the existence of the community can only be predicated upon the next article of the code, which is as follows: " A marriage, contracted out of this State, between persons who afterwards come here to live, is also subjected to the community of acquets, with respect to such property as is acquired after their arrival."

To establish the position assumed, the plaintiff must show, that, after her marriage, her husband and herself came here to live. She must make all the proof necessary to establish the domicil of *Franklin* in Louisiana; and further, that they both came to that domicil to live, and that they did live there until the marriage was dissolved, by the death of *Franklin*.

I will first dispose of the question of domicil, and, in relation to it, I may premise, that the district judge properly overruled the exception taken by the counsel of *Mrs. Acklen*, to the admission of the depositions taken under commission by the executors and trustees, to prove that the matrimonial domicil was in Tennessee, and because the cross-interrogatories have not been answered. Those depositions were received by the magistrate to whom the commission was sent, in the presence of the parties and their counsel, and the cross-interrogatories were answered, as far as the parties in interest desired them to be so; the cross-interrogatories, not answered, were irrelevant to the issue, and of such a character, as would have justified the district judge, if he had caused them to be erased from the records of his court.

The district judge says, in his opinion, that he is satisfied, from the evidence, that the domicil of *Isaac Franklin*, at the time of his marriage, and up to the period of his decease, was in the State of Louisiana. It is with great reluctance that we differ from the judges of the first instance on questions of fact; but'a question of domicil is not a mere question of fact, and we may well agree with our learned brother on all the facts going to show a residence in Louisiana, and, at the same time, differ from him on the legal inferences he draws from those facts, that the residence they establish, was the domicil of *Isaac Franklin*. His domicil of origin was in Sumner county, State of Tennessee; that domicil, of course, continued until another was acquired, *animo et facto*. And the parties seeking to avail themselves of the change of domicil, from Tennessee to Louisiana, must prove it by express and positive evidence; so long as any reasonable doubt remains, the legal presumption is, that it was not changed. See *Grevillon's Heirs* v. *Richards' Exrs.*, 13 L. R. 299. *Cole* v. *Lucas*, 2 Ann. 250. Merlin Rep. *verbo* Domicil, § 2. Story's Conflict of Laws, No. 41.

Does the evidence, in this case, establish, beyond reasonable doubt, that the domicil of *Isaac Franklin*, at the time of his marriage, and up to the period of his decease, was in the State of Louisiana?

The witnesses for *Mrs. Acklen*, all testify that much the largest portion of his fortune was in Louisiana; that they considered him as domiciliated in the State before and since his marriage; and that, they believe, he so considered himself. The witnesses of the executors, in greater number, and of equally unimpeachable character, testify, still more positively, that his domicil was on his Fairview plantation, in Sumner county, State of Tennessee; that he so considered it himself, and that nobody there knew, or suspected, that it had ever been changed. Conflicting, as this evidence is, the acts and declarations of *Franklin* himself are, if possible, still more so. He voted in the parish of East Feliciana, where his plantations are situated, for a member of the police jury, and also at the presidential election of 1844; on both occasions his vote was at first challenged, but finally received, on his declaration, that he had voted no where else for seven years. The justice of the peace who presided at those elections, has testified that *Franklin* was not sworn on those occasions, every body being satisfied with his declaration; yet, there is record evidence that he voted in Sumner county, in the State of Tennessee, at the general elections of 1841 and 1843, and that, up

to the time of his death, his name was registered, under a law of the State, as a <span style="float:right">SUCCESSION OF<br>FRANKLIN.</span> voter of that county. Many notarial acts are produced, passed between the years 1838 and 1846, in which he represented his domicil, or rather his residence, as being in Louisiana; but, it is in proof, that he availed himself of his privilege, as a citizen of Tennessee, to bring suits in the federal court, in this city, in 1840 and 1844; and that, in the latter part of 1845, a few months before his death, he was sued, as a citizen of Tennessee, in one of the courts of this city, and answered to the merits without pleading his domicil in West Feliciana. His statement to *Mr. Warfield*, that he could change his domicil from Louisiana to Tennessee, and back, for five dollars, when his business required it, shows what he understood by domicil, and that the *animus manendi* had nothing to do with it. The declaration of intention to change his domicil, from Tennessee to Louisiana, made in 1832, is falsified by his subsequent acts, and the erection of a permanent family residence in Tennessee. He was, at that time, a slave dealer, and was absent every summer from the State; the object of the declaration was, no doubt, to evade the law, as settled by the decisions of the Supreme Court, that the prescription of one year against the redhibitory action, was suspended during the absence of the party, who had sold the unsound slave. *Morgan v. Robinson*, 12 M. R. 76. Much reliance is placed on two letters from *Franklin* to his father-in-law; the first was written on board of a steamboat coming down the river, and in it, *Franklin* says, that he will, without accident, be at home on the next day; the other was written from New Orleans, in January, 1846, in which, after attending to the misconduct of his slaves on the Fairview plantation, he says: "I will be compelled to break up that whole establishment, if I do not change my mind. I will take the greater part of the hands off next fall, and put them on some of my lands in Louisiana; they give me more trouble than all my other property."

I do not attach to this evidence the importance which counsel do; he might well have his domicil in Tennessee, and call his Feliciana plantations his home, while in Louisiana. When he speaks of breaking up his establishment in Tennessee, he evidently contemplates the breaking up of the planting establishment there, by removing the greater part of the one hundred and thirty slaves, attached to the Fairview plantation, to Louisiana, and leaving only such as might be necessary for the care of the grounds and buildings, and of the stables and stock; he might have done all this without the least intention to change his domicil. The law which fixes the domicil of each citizen at the place where his principal establishment is situated, means the principal domestic establishment, not that where he may have the largest portion of his fortune. Art. 42 C. C.

In France, where, owing to the different systems of laws and customs formerly existing in the different provinces, questions of domicil have been much discussed, and are thoroughly understood, it is held, under a legislation which we have copied, that a place where a person exercises his political rights, and where the bulk of his property is situated, is not reputed his place of domicil, if that person, having a dwelling house elsewhere, habitually occupies it, and pays there his *taxe personnelle et mobilière*. See the case of *Saiffert v. Seranega*, 10 Sirey, part 2, page 55.

There are other facts, not yet noticed, which far outweigh, in my mind, the statements in *Franklin's* letters, and the other evidence offered by *Mrs. Acklen*. *Franklin* was born in Sumner county, where his father gave him a farm, after he became of age; he then engaged in business, spending the summer months in the district of Columbia, and the remainder of the year in

SUCCESSION OF
FRANKLIN.

New Orleans and Natchez.  He soon became wealthy, purchased the Fairview estate, near his Tennessee farm, and erected upon it a large and costly mansion, which is shown to be the finest country residence in Tennessee.  The grounds around were planted with choice trees, and laid out in the best manner; here he had green houses, flower gardens, sumptuous furniture, several fine carriages, choice wines of all kinds, a stable of race horses, a large quantity of blooded stock, and a number of picked servants, more than sufficient even for such an establishment.  All this was done with the avowed purpose of making Fairview his permanent domicil.  He was engaged in business until 1839, but although, up to that time, he only occupied his new dwelling a few days in each year, his intention, coupled with that occasional residence, was sufficient to continue his domicil on the Fairview estate.  In 1838 he acquired a large estate in West Feliciana, and married *Mrs. Acklen* in the spring of 1839; from that time to his death, with one or two exceptions, he spent his summers with his family on the Fairview estate, leaving about the middle of October, of each year, to return to Louisiana, where he remained until the month of May following.  The nature of his residence here is stated as follows, by *Mr. Row,* one of *Mrs. Acklen's* witnesses:

" *Mr. Franklin* usually remained at his plantation, when he returned in the fall, some one, two, or three weeks, and then took his family to New Orleans, where they remained some time, and returned to the plantation, and so went and returned to and from New Orleans, two or three times during the winter." He spent more than half of his time in the city of New Orleans, and, it is proved, that he passed the entire winter of 1845 there, in a rented house.  The house he occupied, when upon the plantation, was old, and out of repair.  The servants who waited upon him there, were those he brought with him every fall from Tennessee.  He kept no carriages, had done nothing to improve the grounds, and had none of those comforts and luxuries in which he delighted, and by which his home in Tennessee was rendered conspicuous.  The fact, sworn to by some of the witnesses, that he intended to erect a new house in West Feliciana, weighs but little on the question of domicil at the time of the marriage.  In 1841, when he was declaring, in notarial acts, that his domicil was in this State, he was secretly making his will, in which he represents himself as of Sumner county, State of Tennessee, now residing, for the present, in West Feliciana; designates the Fairview estate as the future residence of his wife and children, and gives his wife the household and kitchen furniture, and the stock of wines and groceries, found on the place at the time of his death.  None of these, which so essentially constitute his domestic establishment, appear to have existed on the Louisiana plantation.  In that will, also, he ordered his executors to consecrate at least one acre of ground on the Fairview estate, to the erection of an expensive family vault, in which his remains, those of his wife and children, and of such other members of his family as might choose to be entombed there, were to be deposited, and requested them, if he should die at any other place, to have his remains removed there without unnecessary delay.  I take this disposition and request to be strong evidence against *Mrs. Acklen.*  The belief of the Romans, that the souls of the departed abided near their earthly remains, and, under the name of *lares,* were the guardian spirits of their descendants, was a beautiful superstition, and, even Christians may hope, without sin, that they will be permitted, in another life, to watch over and protect their offspring.  The reason of the rule of the civil law, which made the presence of the *lar* indicative of the place of domicil, has survived the superstition that gave it birth.

The place selected by the testator, in this case, for the final resting place of himself and his family, was, I cannot doubt, the home of his choice, the place where his spirit dwelt during life, and whence, in the language of the Roman Code, he had no desire to depart, unless compelled by business, and was a wanderer when he had left it, but ceased to be so when he returned to it. C. 10, 39, 1. 7.

The law of domicil, as it bears upon a case where the party has two residences, was examined with great care by this court, in the case of *Hill et al.* v. *Spangenburg*, 4 Ann.; and the authorities adduced in this case, have confirmed us in the view we then took. " Where each of the residences is accompanied by some of the circumstances, going to show the existence of the domicil, the judge should be guided by the most convincing; he should also take their number into consideration; and if, by their weight and number, they neutralize each other, the presumption that there has been no intention to change the domicil, must prevail; and, if the party has divided his time alternately between the two places, this habitual change should be considered as of no importance, if he has not done, where the new domicil is claimed, a series of acts, proving, beyond reasonable doubt, his intention to abandon his old domicil." 1 Duranton, No. 358. Tested by these principles, the case is clearly against *Mrs. Acklen.* So far from having shown affirmatively, as she was bound to do, that the domicil had been changed, I think it is satisfactorily proved that the change never took place. *Franklin's* domicil having continued in Tennessee, it necessarily follows that he and the plaintiff never came here to live, and that their marriage was not subjected to community of acquets and gains.

This case is strikingly similar to that of *DeSinceny*, c. *Ses. Syndics*, found in Dalloz, 1849, 2 part. p. 71. The plaintiff, in that case, had established at his new place of residence a large sugar refinery, had lived there many years, had been appointed maire of the commune, chef de bataillon of the national guards, and placed on the list of electors, had represented himself in a great number of acts as a sugar refiner of that commune, and had made a declaration of domicil, in due form, a short time before his failure.

But the court, considering that the first domicil was that of his nativity; that it had been his habitual place of residence; that the traditions of his family and the habits of his life, as well as the largest portion of his fortune were there; that if, in a great number of acts, under private signature, he stated the last place of residence to be his domicil, those declarations lost their weight when at the same epoch, and in acts more serious, he retained his original domicil; that the declaration of domicil lately made by him, would not have been necessary, if, in truth, his domicil had been as stated, and was, moreover, falsified by the facts of the case; that his furniture and household establishment were still at the original domicil, and that none of the facts proved, implied the certainty of the complete abandonment of that domicil, maintained the exception to the jurisdiction of the court of his last place of residence, over the *cessio bonorum*.

Having come to the conclusion that no community ever existed between *Mrs. Acklen* and *Isaac Franklin*, it is unnecessary to examine the grounds of nullity alleged against the acts of renunciation, which she signed; her rights against the succession rest upon the will alone, and the errors set up by her have not impaired those rights.

The only question remaining is as to the validity of the bequest of one-third of the real estate and slaves belonging to the succession of *Isaac Franklin*, in Louisiana, to *James* and *William Franklin*, in trust, for the Franklin Institute,

SUCCESSION OF
FRANKLIN.

The bequest is as follows: " I give and bequeath all my property, real and personal, of whatever kind or nature, that is situated in the States of Tennessee and Mississippi, or any other common law State where trust estates can be created, together with my bank stocks, and effects, and credits; and in case I should have no other children by my said marriage, except my said daughter *Victoria*, then two-thirds of all my property, movable and immovable, that is situated in the State of Louisiana; but if there should be two children born of said marriage, then only an undivided half of all my said property, movable and immovable, slaves, &c., that is situated in said State of Louisiana; and, if there should be three or more children born of said marriage, then I only give an undivided one-third part of all my said property, movable and immovable, slaves, &c., that is situated, lying and being in said State of Louisiana ; and, also, the rest and residue of my estate, wherever situated, in trust to my two brothers *James* and *William Franklin*, of Sumner county aforesaid, for the following purposes, to wit: The revenues arising from said property, bank stock, and such money, funds or other credits due me, as may remain after the payment of the several legacies and devises, annuities, increase and ameliorations of my said plantations in Louisiana, and other purposes, as directed by this will, together with the revenues arising from my plantations in Tennessee, and other property in Tennessee and Mississippi and other common law States, together with the dividends of my bank stock and interest on money and debts due me ; and the revenues of the one-third, one-half, or two-thirds of all my property situated in the State of Louisiana, as the case may be, by the birth of children of my said marriage, after the payment of said several devises and legacies, annuities and expenditures, increase and ameliorations of said plantations in Louisiana, &c., to be laid out in building proper and suitable edifices, on my said Fairview plantation, in the county of Sumner and State of Tennessee, for an academy or seminary ; the furnishing the same with fixtures and furniture, and the employment of such teachers and professors, male and female, as may be considered necessary by my said trustees for the education, board and clothing of the children of my brothers and sisters and their descendants, as well as my own children and their descendants, in the best and most suitable and proper manner for American youths, having a particular regard to a substantial and good English education, and such other, higher and ornamental branches as the aforesaid revenues, &c., will enable my said trustees to accomplish; and if the revenues, &c., should be sufficient therefor, I also wish that the poor children in said county of Sumner, of unexceptionable character, and such as my said trustees may select, should likewise be educated and supported, during the time, at the same seminary ; and after the death of my aforesaid brothers, it is my will and desire that the aforesaid trust shall be continued and pass over forever in the heirs of my said brothers, to pass the estate, and that the magistrates of the county court of said county of Sumner, and State of Tennessee, and their successors in office, be hereafter the perpetual superintendents of the aforesaid seminary, to see that my intentions are fully carried into effect."

The title which the testator has attempted to create, belongs to a class of tenures familiar in the other States of this Union, where the common law prevails, but unknown to the laws of Louisiana. And the jurisprudence regulating and defining the almost infinite variety of those tenures, and the rights of obligations arising under each, forms one of the most important and intricate portions of that artificial system of laws. I do not see the possibility of recognizing trust estates here, without letting in all the law which regulates that peculiar tenure

of property. Counsel have referred us to no precedent that would authorize or <span style="float:right">Succession of<br>Franklin.</span> justify the enforcement of such a title; and it is a self-evident proposition, that the constitutional inhibition to the Legislature to adopt any system of foreign laws, by general reference, would be rendered nugatory, if courts of justice assumed the power to introduce those systems, by piecemeal, in this insidious manner.

The case of *Harper* v. *Stansborough*, 2 Ann. 380, was a much stronger one than the present in favor of the legatee; in that case the bequest had been made in the State of Mississippi, where it was authorized by law; the testator had died there, and the law of that State had had its full effect on the slaves in dispute, during several years, when they were removed to Louisiana, where the surviving son of the testator came to claim them from *Stansborough*, who had purchased them at the probate sale of the succession of the other son, on the ground, that by the dispositions of the will they were to revert to him after the death of his brother. Even under that state of facts we held, that as no such title to property, as that under which the plaintiff claimed, was recognized by the laws of Louisiana, the courts of the State could not enforce it upon property found here, although it might be valid in the place where it was created. The chief justice, who was the organ of the court in that case, says, "slaves are considered in Louisiana as immovables, and it rests with the legislative power of the State, exclusively, to regulate the different descriptions of property, or ownership in relation to them. The modifications of the rights of property, under our laws, are few and easily understood, and answer all the purposes of reasonable use; it is incumbent on courts to maintain them in their simplicity."

This opinion has since been reviewed and affirmed in the case of *Terrell et al.* v. *Allen*, 7 Ann., and the principle it involves is recognized in every system of jurisprudence. It is thus elucidated by Lord Brougham, in the case of *Kippell* v. *Bayley*, 8th English Chancery Reports, 120: "There are certain known incidents to property and its enjoyment; among others, certain burdens wherewith it may be affected, or rights which may be created and enjoined over it by parties other than the owner, all which incidents were recognized by law.

"All kinds of property, however, all these holdings, are known to the law, and familiarly dealt with by its principles. But it must not, therefore, be supposed that incidents of a moral kind can be devised and attached to property, at the fancy or caprice of any owner. It is clearly inconvenient to the science of the law and the public weal, that such latitude should be given. There can be no harm in allowing the fullest latitude to men in binding themselves and their representatives—that is, their assets, real and personal, to answer in damages for breach of their obligations. This tends to no mischief, and is a reasonable liberty to bestow; but, great detriment would arise, and much confusion of rights, if parties were allowed to invent new modes of holding and enjoying real property, and to impress upon their lands and tenements a peculiar character, which should follow them into all hands, however remote."

It was contended, in argument, that the only illegal conditions which could affect the validity of a testamentary disposition, were those containing prohibited subsitutions; that all other illegal or impossible conditions were to be reputed not written.

Under the hypothesis, that the words in trust, in this case, should be reputed not written, the title must have vested in the original trustees, in full ownership; and, if it did, the charge to preserve and return the property to other persons after them, would be such a substitution as would avoid the entire disposition.

But I am satisfied that this case does not come within the rule established by article 1506 of the code.

When the words of the testamentary disposition are sufficient to vest a legal title in the legatee, and the intention of the testator to create such a title for his benefit, to the exclusion of the heirs at law, and of all other persons, is ascertained, then, in furtherance of that intention, any impossible or illegal condition the disposition may contain, is presumed to have been inserted inadvertently and is reputed in law, not written; but where the title, created by the will, as ascertained by the words used and the intention of the testator is a tenure of property which our laws do not recognize, the attempt to change the nature of it and to convert it into a title valid under our laws, would no longer be an interpretation of the will, but the making of a new will for the testator. When it is manifest, says Coin Delisle, that the testator has not correctly expressed his thoughts, the proper, natural and unusual sense of the words should only be departed from, to adopt the less usual and less correct sense which the will shows he gave to them, without placing arbitrarily in the place of the written disposition, another disposition which the terms used in no sense authorize; this would no longer be interpreting or explaining the will, it would be disposing for the testator. Donat. and Test. book 3, tit. 2, No. 7.

I put this case upon the principle, that when the conviction is of the essence of the title created by the bequest, and intended by the testator, so that the title cannot stand without it, if that title be one which the law does not recognize, courts of justice cannot replace it by another, and the disposition must fall.

There is another serious objection to the claim of the trustees. Art. 1477 of the code provides, that donations *mortis causa* may be made in favor of a stranger, when the laws of his country do not prohibit similar dispositions from being made in favor of a citizen of this State. The property bequeathed, now in controversy, is all immovable under our laws, and is to be held in Tennessee, for the benefit of a charity created there. The trustees have not shown, that neither a citizen or a corporation of Louisiana, can take real estate by will in Tennessee, or if they can, that they would have power to hold and administer it, for a charity in Louisiana. It is said they may, because the prohibition of the code has exclusive reference to citizens of other countries, and should not be extended to sovereign States or corporations. This is manifestly wrong; the authority of Mackeldy, cited in support of another part of this case, shows, that under the civil law, corporations required the action of government to give them the powers of natural persons, and that they possess no others.

By the textual provision of our code, corporations legally ordained, are substituted for persons. Art. 423. *Milne's Heirs* v. *Milne's Executors*, 17 L. R. 54. The only questions which have heretofore arisen under that provision, were, whether corporations had the capacity to take by will, as natural persons; it has never been pretended before, that they enjoyed all the rights without being subject to the disabilities of natural persons. It has been urged, that the prohibition to a citizen of Louisiana to make donations *mortis causa* in favor of citizens of other States, conflicts with the second section of the 4th article of the Federal Constitution, guaranteeing to the citizens of each State, all the privileges of citizens of the several States. This argument may be answered by inquiring, whether the article of the Constitution also applies to black citizens of Massachusetts or Ohio coming to Louisiana, and whether such a latitu-

dinarian construction would not be destructive of the sovereignty of the State, as well as of the security of its inhabitants.

The disability of citizens of one State to inherit real estate in another, as well as the disabilities resulting from color in the slave States, existed before the adoption of the Federal Constitution, and during the sixty three years it has been in operation, the article invoked has never been held to apply to either class of cases. It is too late now to adopt a different interpretation.

But all this argument assumes, that there is in this case a foreign corporation created, in execution of the will of the testator. The fact is not so. The bequest is not made to a corporation to be created after the death. And I do not understand how the trustees under the will, can be viewed merely as detainers of the estate until the charity was incorporated, and the bequest itself, a naked trust, uncoupled with an interest, to be executed as soon as practicable, when the testator, so far from providing for such an incorporation, expressly directs that the trust shall be continued and pass over forever in the trustees appointed and their heirs. Nor is it true, that the trust was uncoupled with an interest. The charity of the testator began at home; the institution contemplated by him, is for the education of the descendants of the trustees, who were, in succession, to manage the trust to the end of time; they all had a direct interest in the bequest, and on that ground also, if the title was otherwise valid, I would be inclined to consider the bequest not merely as an attempt to create a perpetuity, but as containing an indefinite series of prohibited substitutions. In principle, this case cannot be distinguished from that of the *Philadelphia Baptist Association et al.* v. *Hart's Executors,* 4 Wheaton, p. 1, decided under a system of laws, which goes further than ours in the maintenance of charitable bequests. In that case, the bequest was made in trust to an association unknown to the law; the court held, that it could not take, and that its subsequent incorporation could not give it capacity to receive, to the prejudice of the next of kin; the court intimated, that if the trustees named in the will had been authorized to execute it, as individuals, the bequest would have been sustained, because trust estates are recognized at common law; but as they are unknown to the laws of Louisiana, the trustees in this case occupy identically the same position which the individual members of the unincorporated association occupied in the other. Chief Justice Marshall, the organ of the court in that case, said in his opinion, "the bequest was intended for a society which was not at the time, and might never be, capable of taking it; according to law, it is gone forever; the legacy is void, and the property vests, if not otherwise disposed of by the will, in the next of kin. A body corporate, afterwards created, had it even fitted the description of the will, cannot divest this interest, and claim it for their corporation."

In a subsequent case, Mr. Justice Story says, with reference to that opinion, " upon that occasion, I had prepared a separate opinion, but that of the chief justice was so satisfactory to me, that I did not deem it necessary to deliver my own." 3 Peters, 148.

The case of *Milne's Heirs* v. *Milne's Executors,* already quoted, was one of a bequest *per verba de futuro* to corporations not then in existence, which was to take effect when the corporations should be created. And in the case of *Inglis* v. *The Trustees of the Sailors' Snugharbor,* 3 Peters, 145, the majority of the Supreme Court of the United States, interpreted the devise as being one of the same class; neither of these cases conflicts with the decision

SUCCESSION OF in the case of the Baptist Association, which is on all hands, admitted to be law.
FRANKLIN. I concede, that the weight of authority, under our system of jurisprudence as well as at common law, is in favor of the validity of dispositions *per verba de futuro*, to corporations not *in esse*, to take effect when they are created. But the bequest in this case, is of a different kind; in the words of Judge Story, " it is a devise *in presenti* to persons who should be officers at the death of the testator, and to their successors in the trust; the vesting of the devise was not to be postponed to a future time, until a corporation could be created. It was to take immediate effect, as in the case of the Baptist Association. See the case of the Sailors' Snugharbor.

It has been further urged, that the character of this legacy as a charity, entitles it to the protection of the court, and that we are bound to interpret it in the sense in which it can have effect, rather than that in which it can have none. This rule of interpretation is subordinate to the one which precedes it in the code, that in the construction of acts of last will, the intention of the testator must principally be endeavored to be ascertained, and is only applicable to cases in which that intention is left doubtful.   Art. 1705.

A testament is a law, and the first duty of courts in this, as in other laws, is to ascertain the *mens legislatoris ;* when it is once ascertained, beyond reasonable doubt, it must be followed, and the disposition stands or falls, as the intention of the testator can or not be carried into effect consistently with the rules of law.   The testator's intention in this case, was to create a perpetuity and a new tenure of property; that intention is a legal impossibility, and the disposition falls.

Under the view I have taken of the case, it is unnecessary to answer the argument, that the establishment of perpetuities by will, is not prohibited in . Louisiana.   I may state, however, that the powers given to testators by the code, are exceptions to the general law, regulating the devolution of property ; that they are limited both as to form and substance, and that it is not enough to say, that perpetuities are not prohibited, it should be shown that they are authorized.   The testator has full power to vest in his legatees the title to the property he leaves; but he cannot vest in them a title which he has not, and if he attempts to do so, the legal title of which he does not dispose, passes to his heirs at law; the extent of his power over his property after his death, is the right to separate the usufruct from the ownership for a single life.   If he attempts in any manner to control the descent of the property after the death of the first legatee, the entire disposition falls.   He cannot change the nature of the title he transmits, or, in the language of Lord Brougham, " impress upon his lands and tenements a peculiar character, which should follow them into all hands however remote;" such as would be impressed upon them by the creation of a perpetuity.   His power is limited to the transmission of the title he holds.   He may use, and abuse, his property, while he lives, and delegate those rights to others by will; but he must divest himself of both, when the power to use terminates; by his death the right to abuse also ceases; and if he attempts to exercise that right by creating a title which cannot be enforced, without subjecting the soil of Louisiana to the dominion of foreign laws, the disposition falls, and is superseded by the general law of successions, unless the heirs at law have themselves been superseded by other dispositions in the will.

For the reasons assigned, it is ordered, that the judgment in this case be reversed.   It is further ordered, that in the settlement of the succession of

*Isaac Franklin*, his domicil be considered as having been in the county of Sumner in the State of Tennessee. It is further ordered, that the compromises entered into between *Mrs. Acklen* and the executors, and the renunciations made by her to the community rights she might have in the property left by *Isaac Franklin*, be held valid and binding; and that there be judgment against her upon her claim, as common in acquets and gains. It is further ordered, that the universal bequest contained in the will in favor of *James* and *William Franklin*, in trust for the purposes therein specified, be set aside and annulled, so far as it bears on the real estate, slaves and immovables, by the destination of law in the State of Louisiana. It is further ordered, that the said *Mrs. Acklen* recover from the executors and trustees of the Franklin Institute, all the said real estate, slaves and immovables, by the destination of law in Louisiana, 19-96ths in her own right as heir of her two children, *Victoria* and *Adelicia Franklin*, and the other 77-96ths as tutorix of her minor daughter *Emma Franklin*. It is further ordered, that the costs of the district court be paid by the succession, and those of this appeal by *Mrs. Acklen*.

SLIDELL, J.  I. "A marriage, contracted out of this State, between persons who afterwards come here to live, *(s'y établir,)* is also subjected to the community of acquets, with respect to such property as is acquired after their arrival." Civil Code, 2370.

Did *Franklin* and his wife live in Louisiana—were they established here, in the true sense of the language used in the code?

We are first to ascertain the true meaning of those expressions, and then apply them to the facts of the case.

My opinion is, that by these words, we are to understand the domestic domicil, the true and permanent home; that domestic hearth, where the husband and wife have surrounded themselves and their offspring with the comforts of domestic life, and from which, when he and his wife occasionally depart, for the purposes of business or pleasure, they do so with the intention to return.

I acknowledge, that when I attempt to apply these principles to the conflicting testimony in this cause, there is some difficulty. My first impression, at the oral argument, was rather in favor of *Mrs. Acklen's* pretensions. But, on carefully perusing the evidence, after stripping the case of the difficulties which the untruthfulness of *Franklin*, in his public acts and declarations, has thrown around it, and endeavoring to ascertain the true intention, the true circumstances, the true acts, which ought to control this question, my mind has been brought to the conclusion, that the true, fixed, and permanent home of the husband and wife was in Tennessee; and that Louisiana was, both to himself and his wife, after their marriage, a temporary resort, for the purposes of business and pleasure. I consider Louisiana their transitory residence, for those purposes, during a portion of the year, and Tennessee their home.

In coming to this conclusion upon this mixed question of law and fact, I have been influenced by the well-settled legal principle, that where there is doubt upon such a question, the original home is to be considered the true home.

I therefore conclude, that between *Franklin* and his wife, the community of acquets did not exist.

II. With regard to the bequest to his brothers and their heirs, forever, in trust, of certain property, the revenues to be employed in establishing and maintaining an academy in Tennessee, to be superintended by the magistrates of Sumner county, and their successors in office, as particularly set forth in the will, to

SUCCESSION OF    which I refer for a more full exhibition of the terms and nature of the bequest.
FRANKLIN.    I am clearly of opinion, and was so from my first perusal of the will, that said bequest is void, so far as concerns the immovables in Louisiana.

I consider it as establishing a tenure of property unknown to our laws, highly inconsistent with their spirit, creating an entail, and, substantially, involving, in a very aggravated form, prohibited *fidei commissum* and substitution.

I will observe, that it is not pretended that the testator ever had the idea of conferring a benefit upon his brothers, to whom he gave what, in the language of a foreign jurisprudence, with reference to which the will was framed, would be called the legal estate. This point has been satisfactorily discussed in the opinion of Mr. Justice Rost, and I do not think it necessary to enlarge upon it.

For the above reasons, and referring to the views of Mr. Justice Rost, in which, mainly, I concur, for an ample discussion of the law and facts, I accede to the decree prepared by him.

EUSTIS, C. J.    After a very careful examination of the testimony concerning the place where *Franklin* must be held as having lived, in the sense of the code, I concur in opinion with Justices Rost and Slidell.

In relation to the validity of the trust estate attempted to be established by the will, I scarcely consider the question as an open one, in the present state of our jurisprudence; and I consider the argument in their favor, as a proposition to make an entire innovation in the law of titles to real property, and to introduce the English trust estate, in opposition to the positive prohibition of the code and the established jurisprudence on that subject.

In the prohibition of the code of 1808, which has remained unchanged by that of 1825, I think the most general and comprehensive terms which the legislator considered appropriate, have been made use of. At the commencement of the dominion of the United States in Louisiana, some of the lawyers from the old States were disposed to introduce here the system of laws with which they were familiar. It was natural for them to prefer a change which would enable them at once to make available what they had already acquired, to the toil of learning a system with which they were unacquainted, and which presented the additional difficulty of being in a foreign language. Efforts were not spared by this portion of the profession to introduce the common law, as it has been since introduced and prevails in the other States, whose territory formerly belonged to France and Spain.

But of the members of the bar conversant with the common law, the most eminent did not favor its introduction as a general system, and the consequent exclusion of the civil law. In relation to public and personal rights in criminal proceedings, in commercial and maritime cases, the laws of Louisiana were assimilated to those of the other States; but, in relation to real property, and its tenures, the common law or the English equity system has never had place in Louisiana.

The views of these distinguished men, reflecting the evident sense of the people, were impressed on the legislation of the State. The subject was deemed of such moment, that it was not trusted to ordinary legislation; and hence the provisions, in both the Constitutions of 1812 and 1845, which prohibit the introduction of any system of laws by general reference.

In this condition of opinion, the codes of 1808 and 1825 were prepared and enacted. The prohibition certainly embraced the substitutions and *fidei commissa* of the Roman, the French and the Spanish laws. Strange, indeed, would it be if the prohibition, embracing all these, should exclude the English trusts

and retainders, with all their train of intricate and, except to the initiated, unin- telligible modes and distinctions.

This prohibition was established from policy, in the interest of public order, for the purpose of preserving the simplicity of titles, which were all allodial, and which it was for the interest of society to maintain in their plain and intelligible form.

The terms made use of being thus general, the object of the legislator being known, a construction which would defeat its salutary purpose, is not to be given to it; and such a construction never has been given to it, to my knowledge.

Let us suppose at the time, the question had been put to the legislative council which enacted, or the jurisconsults who prepared, the code of 1808, or to the governor under whose authority it was made, whether the English trusts, executory devises, and the appurtenant jurisprudence was excluded from this prohibition, and were to be introduced into the titles to real property, can a doubt exist as to what would have been the answer? But did the term, *fidei commissa*, in its general sense, include trusts? Was it so intended, and was it so used in the prohibitive clause by the legislator?

Kent says, " A use is where the use of land is in A, in trust; that B shall take the profits, and that A will make and execute estates according to the direction of B."

" In examining the history of uses, we shall find that they existed in the Roman law, under the name of *fidei commissa*, or trusts," vol. 4, p. 289.

Uses and trusts are, in their original, of a nature very similar, or rather exactly the same, answering more to the *fidei commissum* than the *usus fructus* of the civil law. 2 Blackstone, 327.

If the word *fidei commissa* was used in the sense in which the learned commentators used it, it must be considered synonymous with the word trusts. Indeed, it cannot be believed that all trusts were prohibited by the code except English trusts, and that the most obnoxious of all titles, from its complicity and origin, were exempted from this sweeping prohibition and allowed to have a place among the tenures of real property.

It is true that the English trust estate did not exist under the Roman law; it had its origin at another period; but it can be assigned to no place under that system of jurisprudence except as a *fidei commissum*, in its general sense. In its features it certainly most resembles an usufruct, but it is not one, it wants many of the essential requisites of that title.

A trust, as attempted to be created by this will, is a right in equity to the beneficial enjoyment of lands and slaves, of which the legal title remains vested in some other person.

That *fidei commissa* was held to mean trusts, has, I think, been uniformly held by our courts.

In *Mathurin* v. *Livaudais*, the testator had a son who was a slave, and he bequeathed a sum of money to the master as a part of the price of his emancipation. This legacy was attacked on the allegation of its being a *fidei commissum*. The court said, " Our code declares that substitutions and *fidei commissa* are abolished." But the object of this jurisprudence was, as it is well known, to prevent property from being tied up for a length of time in the hands of individuals and placed out of the reach of commerce.

The framers of our code never contemplated to abolish naked trusts, uncoupled with an interest, which were to be executed immediately. If they had, they

SUCCESSION OF would not have provided, in a subsequent part of the work, for testamentary
FRANKLIN. executors, described their duties and recognized the validity of their acts. The
obligation imposed on the legatee, by the acts of the testator, cannot be distin-
guished from that of the executor, except in name. 5 M. R. 302. Judge Mar-
tin, in delivering the opinion of the court in the case of *Clague* v. *Clague*, in a
clause of a will by which the executors were directed to retain the property of
the succession until the majority of the testator's children, says : " Such a dis-
position is indeed a *fidei commissum* or trust, which the law forbids."

I do not deem it important to refer to any other decisions on this point,
because I have no knowledge of any trust estate, created under the laws of this
State, nor of any case in which the legality of such an estate has ever been
recognized by our courts.

There are cases in which assignments of insolvents, residing out of the State,
have been recognized, and foreign assignees, syndics and mandatories have been
permitted to sue for and recover property to which they were entitled, for the
benefit of creditors. There are certain testamentary trusts, which so far from
being prohibited, are expressly recognized by the code, and are absolutely
necessary in order to carry into effect the lawful dispositions of testators.

But I am not aware of any trust estate created in Louisiana, which has been
recognized as a legal tenure, adversely to third persons having an interest. Of the
difficulty of dealing with this description of title, which has sometimes been
under adjudication, or deeds of trust made out of the State, some idea may be
formed by referring to the cases of *Ricks* v. *Goodrich*, 3 Ann. 212. *Hayden* v.
*Nutt*, 4 Ann. 65. *Gaulden* v. *McPhaul*, 4 Ann. 79.

Mr. Justice McLean, the organ of the Supreme Court of the United States,
in the case of *Gaines* v. *Chew*, 2 Howards' Reports 650, so understood the
jurisprudence of this State. After quoting the article 1507, he says, " This
abolishes express trusts," &c.

I feel at liberty to avail myself of the labors of the distinguished jurisconsults,
whose *memoire* has been submitted to us in the case of *McDonogh's* will, now
under advisement, and to add to my humble convictions, the well deserved weight
of their learning and eminent position in the science of jurisprudence. I say, I
feel myself at liberty, because their opinion on this point has no connection
with anything at all questionable, which is to be decided in that case, in the
judgment of any of the judges ; otherwise, however strong the temptation to
secure such aid, my duty would require me not to adopt it on this occasion.
These learned gentlemen say, " To us, this word *fidei commissa* appears to have
been added to the article 896 of the French Civil Code, in the article 1507 of
the Louisiana Code, in consequence of the English origin of the other States
of the Union, and to prohibit, at the sametime, as much the substitutions of the
old French law, as the trusts of the English law."

I am under the conviction, that the right which a man has to dispose of his
property by will, to take effect after his death, is derived exclusively from the
law of the land, which has established this right as an incident to the right of
property. The law has, code 476, ordained certain forms, and imposed certain
conditions on this species of alienation, which are essential to its validity. Code
1453. A man has no more power to create new or prohibited modes of property,
in the exercise of his right to make a will, than he has in a sale or a donation
*inter vivos*. Between parties, they may hold their property by any tenure or
terms they please ; but as to the establishment of titles effecting the property

itself, there is no power in man out of the law.  Nor has society any interest in attempting to carry into effect the conceits of the dead, to the disturbance of the rules of public order and policy, which regulate the living.

I am, under this conviction, relieved from the necessity of entering into any other considerations, than those which the law holds as controlling the effect to be given to this will.

It is contended in argument, that the article 1506 of the code, is to be applied to the testamentary disposition under consideration.  That article provides, that in all dispositions *inter vivos* and *causa mortis*, impossible conditions, and those which are contrary to the laws or to morals, are reputed not written.

I do not understand this article as applicable to this disposition.  It is not conditional.  The title it creates is absolute—*a trust estate.*  The trust may, by inference, be called a condition, but the trust is of the essence of the title, and I consider the title not as a conditional one, but as an impossible title.  I think it would be a forced and inadmissible construction to give such an application to this article.  I have found no authority which would support it.

This testamentary disposition, I conceive, confers no ownership on the legatees, and the court must hold it to be inoperative and of no effect.

Having come to this conclusion, it only remains for me to state my concurrence in the decree prepared by Mr. Justice Rost.

Preston, J., dissenting.  *Isaac Franklin* was known in Louisiana upwards of twenty years ago, as a dealer in slaves.  He amassed a very large fortune. He then became a most extensive planter, in West Feliciana.  He also had a large farm in Tennessee, and lands in the States of Mississippi and Texas.

In July, 1839, he married *Adelicia Hayes*, in Nashville, by which marriage he had three children, who survived him.  He died on the — day of April, 1846, in the parish of West Feliciana, where his succession was opened.  His will, dated the 24th day of May, 1841, was duly proved, his executors were qualified, and inventories made of his property.  Shortly after his death, two of his children also died.  Inventories were made of their respective interests in his succession, and also of the community of acquets which existed between him and his surviving widow.

*Mrs. Franklin,* on the 12th of Dec., 1846, by an act before a notary public, for considerations expressed in her late husband's will, renounced the community of acquets in these words: "She does, by these presents, accept the said will, and consents to be bound by the same, with all its conditions, and does hereby renounce, relinquish and abandon all rights of community dower, by the courtesy or otherwise, by the laws of Louisiana, Tennessee, or other States, where the property of said *Franklin* may be situated, that she may be entitled to according to the laws of said several States."

The deceased, by his will, made some particular legacies.  He made ample provision for the support of his widow, and gave her a hundred thousand dollars, or an annuity of six thousand dollars, during her life, as she might choose, in case of her second marriage, for the support of herself and children of such marriage.  After these particular legacies, he divided two-thirds of his estate to his children, and the remaining third to establish a seminary of learning in Sumner county in the State of Tennessee.

In May, 1849, *Mrs. Franklin* married *Col. Joseph A. S. Acklen.*  In January, 1850, she, authorized by her husband, declared, before a notary, that she elected to take, under the will of her late husband, one hundred thousand dol-

Succession of Franklin.

lars, with six per cent per annum interest, in full of all her rights of dower, or any other rights, which she had upon the succesion of her late husband.

In December, 1847, the state of Tennessee incorporated the literary institution founded by *Franklin*, in Sumner county, under the name of "Isaac Franklin Institute," and gave it full powers to receive and administer the bequest for the purposes prescribed by the will.

Out of these leading facts, ramified into much detail, a great deal of intricate legislation has arisen between the parties interested. However, but four main questions have been submitted for our consideration, and have been argued with great ability.

1. Whether *Isaac Franklin*, at the date of his marriage, and at that of his death, or at any intervening time, resided in Louisiana; and, consequently, whether a community of property existed between him and his wife, and what effect his residence in Louisiana produces on the devises of personal property left by him at his decease.

2. Whether *Mrs. Acklen* is bound in law by the several acts of renunciation of community, executed by her after her husband's death; or, whether the evidence establishes the execution of those acts to have been induced by such misrepresentation, and founded on such error of law and fact, as entitled her to demand that the acts of renunciation be set aside and annulled.

3. Whether any part of the particular legacies left by the deceased, aught to be paid out of the portion accruing to the forced heirs.

4. And mainly, whether, by the terms of the will of *Isaac Franklin*, the bequest to the trustees contains a substitution or *fidei commissum*, or any other disposition of his property, which, even if not imputed actually written, the definition of either is still null and void, as being in opposition to the whole policy of our law.

The district court has decided all these questions in favor of *Mrs. Acklen* and her minor child. The trustees of the "Isaac Franklin Institute" have appealed.

The views I have taken of other parts of this case, render the inquiry whether *Isaac Franklin* was a citizen and resident of Louisiana, or of Tennessee, at the time of his marriage and death, not so important as it has been regarded by the adverse counsel. But, as it has some bearing upon my opinion, I am obliged to give my reasons for maintaining the decision of the district court.

It is a mere question of fact, and I think the evidence greatly preponderates in favor of the judgment of the district judge. As the judge resided in the same parish with him; was intimate with him; was called as a witness to his will, when made, and to prove it at his death—it is a question of fact, on which, peculiarly, I would submit to his decision, even if I thought the evidence doubtful. But it leaves no doubt on my mind of the correctness of his decision on this question of fact.

For a quarter of a century, *Franklin* was known in this city and State as a trader in slaves, and laid the foundation of his vast fortune in this State by that business.

It being known that the population and improvement of Louisiana was to be achieved in a great measure by emigration, the old, as well as the new Constitution of the State prescribed, that the Legislature shall "prescribe the manner in which a man coming into the State, shall declare his residence." Sec. 12. In pursuance of this clause in the Constitution, the General Assembly, in 1816, prescribed by law: "That an individual coming into the State from any other State of the United States, and desirous of acquiring residence therein, shall

give notice, in writing, to the judge of the parish where he proposes to reside, of <span style="float:right">Succession of<br>Franklin.</span> his intention to acquire residence." Additional facilities were given by law, passed in 1818, but the act quoted was never repealed.

In pursuance of it, on the 28th of February, 1832, *Franklin* presented the following petition, on which he obtained the order annexed, both certified in this suit to be true copies of the record of the court in which they were filed :

"To the Honorable Charles Maurian, Judge of the Parish Court for the parish and city of New Orleans: The petition of *Isaac Franklin* shows, that he is a resident of the State of Tennessee, and that it is now his intention to become a resident of the city of New Orleans and State of Louisiana, and to vacate and cease his domicil in the State of Tennessee. He therefore makes this his declaration of his change of domicil, and prays the same be registered, and a certificate given him according to law.           Isaac Franklin."

*Order.*—" Let the within declaration be filed in the Clerk's office, and a copy thereof be delivered to the person making the declaration.

" New Orleans, 28th, February, 1832.       Charles Maurian, Judge."

This declaration made in pursuance of the Constitution and law of the State, was conclusive of his will and intention to become a citizen and resident of Louisiana. If, as contended, this was done merely to facilitate his business of trading in slaves, it may be answered, that a leading object of all in acquiring a residence in our State is, to facilitate their business, whether it be commercial, agricultural or mechanical.

But, did he follow up his declaration of residence in our State by acts evincing the reality of his intentions? In May, 1835, he purchased the undivided half of near eight thousand acres of land, in West Feliciana, upwards of two hundred slaves, and all the stock necessary for the immense plantation; and immediately formed a copartnership with a resident of the parish, for the purpose of carrying on, as it was expressed, "the business of planting, upon several plantations situated in the parish." It was to continue until March, 1840. In the notarial act, he is described, in pursuance of his declaration, as of New Orleans. In numerous acts, suits and exceptions, from that period until 1840, he describes himself as domiciliated and a resident of New Orleans. He was married in Tennessee, in July, 1839. But a few months before, in a notarial act, passed in Concordia, he described himself as "of the city and parish of Orleans," and about six months before, formally excepted to a suit filed against him in the parish of West Feliciana, "that the legal domicil of this respondent is in this State, in the city and parish of New Orleans. Our code formally declares, that " a married woman has no other domicil than that of her husband." Art. 48. It is so notorious, that our laws are 'so much more favorable to married women than those of the State of Tennessee, that it cannot be doubted *Mrs. Franklin* and her friends considered this, in contracting her marriage, and had a right to avail herself of the advantages of our laws, unless his heirs and legatees could show conclusively, that all this was fiction, or that he afterwards, in truth and reality, removed with her to Tennessee, and remained there till his death.

Now, so far from afterwards removing to Tennessee, as early as 1842, he had removed to West Feliciana, where he had become the undivided proprietor of the vast plantations in which he was before interested—had accumulated together more than five-sixths of his colossal fortune, in immovable property, and where, I have no doubt, his heart was as immovably fixed.

He afterwards avowed, judicially and in public acts, his residence in that parish. But two months before his death, in a notarial act, passed in New Orleans, he described himself as "of the parish of West Feliciana."

He exercised all the political and parochial rights of a citizen, in that parish. His votes were challenged; he satisfied the commissioners, and exercised the right of suffrage. The commissioners of election were liable to indictment, conviction and punishment, for allowing him to vote without evidence of his right of suffrage. Bul. and Cur. Dig. 393. The evidence which it was their sworn duty to take and receive, was his own oath as to his residence; and if he swore falsely, he was liable to the pains and penalties for perjury. Bul. and Cur. 398. Upon the challenge, I cannot doubt that the commissioners did their duty, and that *Franklin* swore the truth; and yet he voted.

It is the sacred duty of his surviving wife to maintain the integrity of these acts; and she should not be divested of rights based upon them without overwhelming evidence.

On the other hand, it is shown, that *Franklin* voted twice, in 1841 and 1843 in Tennessee. Their laws are much less rigorous than ours on the subject of illegal voting, and but six months residence and citizenship of the United States, is required to exercise the right of suffrage. His last vote was in Louisiana. He instituted a suit in the Federal Court of this circuit, as a citizen of Tennessee. It is proved by his own declaration, that it was colorable only to obtain an advantage in a particular case. No one who has an adverse interest, should suffer from these illegal acts.

It is proved, that he had a large and elegant farm in Tennessee, with a hundred slaves, improved with all the conveniences for a residence. The impression on my mind, from the whole evidence, is, that he kept up that farm as an appendage to his immense estates in Louisiana, and as a summer retreat, which he visited, rather than inhabited, in his western and northern excursions. It is certain, that in writing, with the familiarity and confidence of a son-in-law, to the esteemed father of his wife, when returning down the river from Fairview to Belleview, he said, "we are all well and will be at home to-morrow." And, but a few months before his death, as to Fairview, "I will be compelled to break up that whole establishment. If I do not change my mind, I will take the greater part of the hands off next fall, and put them on some of my lands in Louisiana. They give me more trouble than all my other property."

It is proved, by the manager of his estates in Louisiana, that he kept fine furniture in the residence exclusively used by him, on his Belleview plantation, and never moved it. That for two years before his death, he frequently spoke of building a new house, raising a mound and erecting a fine residence to gratify his pride; that he selected the spot, and carpenter to build it, and commenced the cabins, and that one object was, to educate his children at home by private tutors.

The community of acquets has never been a favorite system with me; but *since it is the law of Louisiana, I would as soon think of depriving the wives* of our wealthy citizens of its advantages, because they are able to keep and to retire from the toil of business, a few months in the summer, to their fine houses at the Bay of St. Louis or Pass Christian, as to pronounce that *Franklin* deprived his widow of the community of acquets, by his summer establishment in Tennessee. The tenure of the wife to the community, would be feeble indeed, if, after toiling with the husband three-fourths of the year, with

all the self-sacrifices by which fortune is made on our plantations, the husband might deprive her of it by a summer retreat from home for a few months in the year.

I have no doubt, therefore, that *Isaac Franklin* was a citizen of Louisiana when he contracted matrimony, in July, 1839; and that Louisiana was his place of residence when he died, on the 26th of April, 1846; and, therefore, that a community of acquets existed between him and his wife from their marriage, until it was dissolved by death. But that community no longer exists.

By his will, he gave *Mrs. Franklin* the property she received from her father, with the increase of the same.

He gave her his household furniture and supplies on his plantation in Tennessee. He gave her out of the revenues of his plantation, what she might deem necessary to support her and his children, and to educate them in the best style. He gave her the use of his Fairview plantation, and all that was on it, while she remained unmarried.

And in lieu of it, in case of a second marriage, one hundred thousand dollars, or an annuity, at her election, of six thousand dollars per annum. He gave this large sum to his executors, in trust, for her separate use and maintenance, and that of any children she might have by her second marriage. It was given, however, in full payment " of all her rights of dower or any other rights she might have on his estate."

From the whole tenor of his will, the anxiety manifested to improve and enlarge his plantations, to increase the number of slaves upon them, and state the positive injunction to his executors, to purchase in his plantations and slaves, if from any cause or for any purpose, their sale should be ordered by a court, I have no doubt the donation was made as it purports to be, in full of all rights (including, in my opinion, community rights) upon his estates, that they might be kept indivisible during the minority of his children, in order to place each in possession of a splendid plantation, as they arrived at the age of majority.

The terms of the bequest clearly show this intention and understanding of them as to *Franklin :* " it shall be in full for all her rights of dower, and any other rights she may have on my estate." That this was the understanding of the testator, no one can doubt. For in Tennessee, Mississippi and Texas, she could only have the right of dower on his estates. And the terms, any other rights, to which full effect and meaning must be given, could alone refer to her matrimonial rights on his estate by the laws of Louisiana.

As *Franklin* understood it, so did his widow and her advisers. For, by an act before a notary, made with his executor eight months after his death, she declared, that " she is desirous by these presents, to express her solemn intention for herself and her heirs, to accept each item and all the provisions and stipulations contained in the last will and testament of her beloved husband; and because of provisions made for her on certain contingencies, stated in the will, and in order to comply with the intentions of her deceased husband as manifested in his will. For these purposes, and in consideration of his bequests and of the benefits and advantages she will derive by taking and adopting the will, she does by these presents, accept the will, and consent to be bound by the same, with all its conditions, and does hereby renounce, relinquish, and abandon all rights of community dower, by the courtesy or otherwise, by the laws of Louisiana, Tennessee, or other States, where this property may be situated, that she may be entitled to, according to the laws of those States."

SUCCESSION OF FRANKLIN.

Again, about a year after the death of her husband, reciting specially the property belonging to the community of acquets and gains, which had been inventoried and claimed for her, she ratified before a notary public the renunciation of the community, she had made, in accepting a sum of ten thousand dollars a year, allowed by the will for her support during her widowhood, in lieu of that community. And, as he had given her, further, the use and enjoyment of his Fairview plantation during widowhood, as another consideration for her matrimonial rights, by another notarial act, made about eighteen months after the death of her husband, she renounced that use and enjoyment in favor of "the Isaac Franklin Institute," for the sum of thirty thousand dollars, expressly declaring, that she received it also in consideration of the renunciation of her community and other rights.

And here it is proper further to observe, that *Mrs. Franklin*, having contracted a second marriage, in 1849, she, on the 9th of Jan. 1850, with her husband, elected, by an act before a notary public, to take the hundred thousand dollars instead of the annuity of six thousand dollars, and accepted it in full of all the rights of dower and any other rights she might have upon the succession of her late husband. As it is clear to my mind, that *Franklin* gave this large sum in satisfaction of the community of acquets, under the expression of "all other rights," and to prevent the division of his estates by that or other matrimonial rights, I think she should be compelled to receive it for the consideration for which it was given, according to the understanding of her first husband and herself, until her second marriage, and not according to her present understanding.

*Mrs. Acklen* contends, that the three acts by which she renounced the community of acquets, should be annulled, because made under errors of law and fact. 1. That at the time she renounced, she was deceived as to the extent of the community of acquets, by which she has been greatly injured. I do not think she was deceived. The effects of the community were inventoried minutely, and as accurately as the nature of the case admitted, and was fairly appraised and exhibited to her and even copied into one of the acts she signed. In the next place, I do not think she has been injured by her acts. She has received, under the acts, in consideration of her renunciations, $130,000. The evidence does not satisfy me, that *Franklin* increased his fortune more than $260,000 during the last seven years of his life, while the community of acquets was in existence.

The acts were made while doubts existed whether she was entitled to any community of acquets at all, and which doubts still exist, as appears by the division of opinion of this court on that subject, and were, therefore, made by way of compromise, and might be considered irrevocable on that account.

The motives expressed in the acts, to carry out and accomplish the wishes of an affectionate husband, of a highly useful and benevolent character, he having made a splendid provision for her of what she chose if she remained a widow, and one hundred thousand dollars if she married again, should have great weight in the consideration of this part of the subject. As other than pecuniary considerations, a respect for the memory of such a husband, operated upon her in accepting his will. She is not to be permitted, for pecuniary considerations alone, to disturb rights vested upon that acceptance of the will and renunciation of her community.

It is urged, that she was deceived as to the amount she was to receive, by inheritance, from her two deceased children, it being represented that she was

to receive twice as much as the law allowed her. If this opinion had been correct, she would have received back a little more of what she renounced than the law gives her. She would have received it from her surviving child. It would have been so inconsiderable, and the source from which she was to receive it was of such a character, that I cannot believe it operated at all on her mind. Beside, her right to only a fourth of the successions of her children, being a textual provision of our law, which the notary or any citizen could have stated to her, it is probable she knew the extent of her rights, in this respect, before she signed the acts. The counsel who inadvertently mistook her right in this respect, was not present when the first act of renunciation of her community of acquets was made. It was made in New Orleans, before an intelligent and careful notary. She was surrounded by intelligent friends, who had every possible means of knowing what is familiar to all. I cannot believe that the inadvertance of her former counsel, in a letter to her father, on this subject, some time before her renunciation, had the least influence on her mind.

It is said she was made to believe, that claiming her share of the community would be dissenting from the will of her husband, and, in that event, she could not claim the legacies made to her, and especially the legacy of one hundred thousand dollars in case of her second marriage. I have hastily given my reasons for believing this advice to have been correct. She never can take the hundred thousand dollars bequeathed to her, and claim any matrimonial rights from her late husband's estate, of any kind whatsoever.

I cannot see, in the whole evidence, any reason whatsoever for annulling settlements, made in the most formal and solemn manner, by a lady who has enjoyed the best opportunities of having improved her own mind, and no doubt fully availed herself of them, aided by a most intelligent father, and able and careful counsel, hosts of the best and ablest friends, on account of errors, either of law or fact, which do not clearly appear to have existed, or to have influenced her : and thereby throwing the whole succession, thus happily settled, open again to endless litigation, between a mother and her child, some dozen years hence, when the child marries or arrives at the age of maturity, or even with the instituted heir of a benevolent and affectionate husband.

The next point in controversy between the parties is, whether any part of the special legacies, left by the deceased, ought to be paid out of the portion accruing to the forced heirs.

The children of *Franklin* were the forced heirs of two-thirds of his property, of which the father could not deprive them. Code, 1482. Property, in the sense of this article, means his succession; and the succession is the transmission of the rights and obligations of the deceased to his heirs. Code, 867. Two-thirds of his rights were transmitted to his heirs, with no other duty than to pay two-thirds of his obligations. The aggregate of his donations, therefore, could amount to but one-third of his rights, with the duty of discharing one-third of his obligations. The point submitted, therefore, seems hardly to admit of a controversy, and requires us only to recur to these definitions. The article 1703 of the code is express, that no checks or conditions can be imposed on the legitimate portion of the forced heirs.

But, inasmuch as all the sums paid to *Mrs. Acklen*, were given in lieu and compromise of her share in the community of acquets, right of dower and other rights, upon the estate of her husband, they must be deducted out of the general estate, as claims against it, and not out of the disposable portion,

I think the real and personal property of *Franklin*, wherever situated, belongs to his succession, and must be considered in determining the amount of the disposable portion. And, if it should become important in the settlement of the estate, I have no doubt that the whole of her personal property must be considered as belonging to the place of his domicil, and must be governed and distributed according to our laws.

By far the most important question is the fourth and last. The appellants maintain, that the dispositions in the will of *Isaac Franklin*, establishing a seminary of learning in Sumner county, in the State of Tennessee, are valid to the extent of the portion of his property, of which he had a right, by law, to dispose. His late widow, on behalf of herself and child, contends that those dispositions to establish a seminary of learning in Tennessee, are null and void, because they contain substitutions and *fidei commissa*, reprobated by law, and, if not embraced technically within the definition of either, are yet in opposition to the whole policy of our law. They therefore claim the whole property bequeathed to the seminary.

I am of opinion that the dispositions in favor of the institution, do not contain substitutions or *fidei commissa* reprobated by law, and that so far from being opposed to the whole policy of our laws, that they are most highly favored by our laws, as they are by the jurisprudence of every other civilized State or country with which I am acquainted.

In considering this subject, I will take for granted, that a testator, in Louisiana, can make every disposition of the property acquired by his industry and economy, or good fortune, by donations *mortis causa* which he could make by donations *inter vivos*. It is the greatest inducement of man to industry and economy, and to seek good fortune, to permit him to give that, which is his own, to the objects which he deems most useful.

Individual industry, economy and energy in conquering fortune, result in the general welfare and prosperity of society. The interest of society is thus promoted by allowing to man the free disposal of his property. And it seems to me to be the corresponding duty of society to gratify him with the only earthly consolation he can enjoy in death, the confidence in society, in her laws and tribunals, that the property accumulated by the toil and self-denial of his life, shall be sacredly appropriated, according to his will, to the objects dearest to his heart, and most approved by his judgment.

The code fully authorizes a testator to dispose of his whole property unless restrained by law. Individual interest has added another very indefinite restraining power called "the whole policy of the law," as to which there must necessarily be great varieties of opinion, and which merits, therefore, but little consideration.

By an act of the General Assembly, approved the 25th of March, 1828, "all the civil laws which were in force before the promulgation of the Civil Code of 1825, were abrogated." Unless, therefore, an article of that code or a statute can be presented to me, which prohibits a testamentary disposition, or with which it is manifestly inconsistent, (as, for example, articles enforcing morality and duty,) I shall consider the testamentary disposition valid, and carry it into effect if possible. And, in doing so, will, in pursuance of art. 1706 of the code, interpret the disposition in the sense in which it can have effect, rather than in that in which it can have none.

I find in our code but a single restriction upon dispositions in favor of a stranger, and that is, when the laws of his country prohibit similar dispositions

from being made in favor of a citizen of this State. Art. 1477: There is no <span style="float:right;">Succession of Franklin.</span>
prohibition of a disposition in favor of a foreign State, or corporation, created by
it. If a citizen of Louisiana choose to bequeath his property to the Emperor of
China, there is no law in our code to prevent it. Would you allow a despotic
sovereign, it will be asked, to own and manage property in Louisiana? Certainly, until the equally sovereign State of Louisiana prohibits it by law. And
the danger of the existing freedom from restraint, in this respect, is just as
imaginary as the dangers so much insisted upon in the argument of this case, of
tying up property, bequeathed to a literary institution, from commerce. When
either becomes a real, and not an imaginary evil, the sovereign Legislature of
Louisiana will readily apply the proper remedy, a prohibition by law. In the
mean time, it is not for the courts to imagine danger which does not exist, and
make laws, destructive of freedom and right, to prevent the unreal evil.

I know, too, as a judge, that the State of Tennessee has not prohibited by
law her citizens from making bequests in favor of citizens of Louisiana. And if
she had, or art. 1477 of our code was intended, by way of retaliation, to
prohibit our citizens from making donations *mortis causa* to citizens of Tennessee,
in my opinion both laws would be void, as conflicting with the 2d sect. of the
4th art. of the Constitution of the United States, guaranteeing to the citizens
of each State all the privileges of citizens of the several States.

There is nothing in the suggestion, that colored citizens of other States might
have rights, forbidden by our laws, under this view of the Constitution. Principles of law are to be illustrated by ordinary, not by extreme suppositions.
I have always doubted whether colored persons could be citizens of a State, and
much more, that they can be citizens of the United States, for whom alone the
Constitution of the United States was adopted. I am aware that the courts,
*ampliore jurisdictione*, have held them citizens. A mere suggestion, immaterial to this case, does not render it necessary to refute such decisions.

It has been pressed upon the court, that property in Louisiana can only be
bequeathed to a legatee in being at the death of the testator, and then capable of
accepting the legacy. The late *Alexander Milne* devised half his large estate to
create and establish two charitable institutions in this city. It was done under
our advice, as his confidential counsel, that he had power to bequeath any part
of his estate to a charitable corporation, to be created after his death, if the
Legislature would seasonably incorporate the charitable institutions. I based
my advice upon the opinion, that the provisions of our code, relied upon to the
contrary, and requiring a capacity to receive, at the opening of the succession,
were applicable, in terms and spirit, to natural persons alone, and not to
establishments of public utility; that there was nothing in the code which prohibited the creation of such establishments by will; that they were thus created
in all countries, and greatly favored by modern philanthropy; and, that it could not
be otherwise in Louisiana. As to the notion, that the fee of real property could
not be in abeyance, but must vest, at the death of the testator; that the title must
pass out of the deceased with the breath of the body, to an existing heir. Had
I been deluded, like many lawyers, with that unmeaning jargon of words, which,
without thinking for ourselves, we take for granted, represents necessary realities,
until I carefully perused the opinion of the Supreme Court of the United States,
in the case of *Inglis* v. *The Sailors' Snugharbor of New York*, 3 Peters, 112.

The conclusions of the court, in that case, seem to meet every objection to
*Franklin's* bequest, as to the point under consideration, as it supported the
decision as to *Milne's* will. The court say, "if the first mode, pointed out by the

testator, for carrying into execution his will and intention with respect to this fund, cannot legally take effect, it must be rejected, and the will stand as if it had never been inserted; and the devise would then be to a corporation to be created by the Legislature, composed of the several officers designated in the will as trustees, to take the estate and execute the trust," pp. 114, 115.

The opinion in support of this position was the production of such men as Thompson, Marshall, McLean, and Baldwin, then on the Supreme Bench. It is true, the most learned member of the bench delivered an able dissenting opinion, collected from the learning of antiquity. The more I have read his works, the more I have found that he substituted the learning of books, almost exclusively, for the study of men and things, the worst species of substitution in my opinion.

The decision of the court satisfied me that a testator could create an establishment of public utility by will, and if the sovereign power assented, the bequest would be effectual against his heirs before the courts of any country that had thrown off the shackles of mere terms, and looked, with the wisdom of modern civilization and philanthropy, at things. I therefore advised that old gentleman to venture half his fortune on the faith of that decision, in establishing asylums bearing his name.

Being at the time a member of the General Assembly, and acting under as high obligations in that capacity as these imposed upon me in my present situation, I prepared acts of incorporation of the Milne Asylums, and had them passed through that body, without a dissenting voice, at the next session after the death of the testator.

Those institutions were destined to encounter the most powerful attacks by distinguished counsel on behalf of the heirs of *Milne*, on account of their non-existence at his decease. Those efforts were successfully resisted, and the validity of the bequests, though the donees were not in existence at the death of the testator, was established by the late Supreme Court, in an opinion marked by great ability and unanswerable truth. They based their opinion upon the powerful reasons given by the Supreme Court of the United States, in the case of *Inglis* v. *The Trustees of the Sailors' Snugharbor of New York*. Of the correctness of that able opinion I never entertained a doubt, and to this day subscribe to every sentence it contains.

The great argument in opposition to the Milne Asylums, and of course to the establishment of the seminary of learning in Tennessee, by the will of *Franklin*, is, that the bequests were void, because the institutions were not in existence at the time of the death of the testators. The objection was overruled in the succession of *Milne*; but the correctness of the decision is still zealously and vehemently assailed. It is urged that the general rule is, that the legatee must be *in esse* when the succession is opened, and that, therefore, it is incumbent on the appellants to show that the law makes an exception in favor of the validity of the bequest in controversy. Besides the cases already referred to, the authorities are abundant, that the exception exists in England. Many are collected in the very able argument of Mr. Binney, in support of the will of *Stephen Girard*.

In my opinion, the exception had its origin in the civil law, long before the English customary law was reduced to a regular system of jurisprudence. Without examining minutely the Roman law on this subject, I shall content myself by quoting a short paragraph from the celebrated compendium of Mackeldy, a work universally admitted to be distinguished for its accuracy and soundness of doctrine. In the 145th paragraph of the general part of his work, he says: " The term

*pia causa*, denotes an institution for pious and charitable purposes, or for the public benefit, and is the general name given to every establishment which has for its object the promotion of piety, the relief of necessitous persons, the spread of education, or the advancement of science and the arts. Institutions of this kind are to be regarded as moral persons only, in case they have been recognized as such by the State, by way of approval and confirmation; otherwise, they lack the capacity for rights, and cannot acquire any thing. But the confirmation of them, on the part of the State, may be subsequent to their foundation, and then it has a retrospective effect back to the time of such foundation. If such *pia causa* be confirmed by the State, and thereby recognized as a moral person, it can, not only have rights of all kinds, and make acquisitions *inter vivos* as well as *mortis causa*, but it also enjoys the privileges of minors, as well with respect to *restitutio in integrum*, as concerning the alienation of property.

This exception to the general rule, as thus enunciated by Mackeldy, is not, as has been contended, the mere creature of the statutory laws of Rome ; but has its foundation in correct reasoning and the very nature of things. When the lawmaker lays down the general rule relative to the acquisition of rights or property by natural persons, by means of a testamentary disposition, he requires the existence of the legatee or testamentary heir at the time of the death of the testator ; for, he who is not in being cannot acquire anything. But, when a testator is desirous of becoming the founder of a charitable or educational institution, he does so on the implied condition, that the State will ratify and confirm his benevolent intentions. If the confirmation is withheld, the will is defeated ; but if granted, it operates like the accomplishment of all suspensive conditions, whether express or implied, and has a retroactive effect. The correctness of these views is, I believe, recognized in every system of jurisprudence, both ancient and modern. And I have heard nothing in the argument of this case, to induce me to entertain the slightest doubt of the soundness of the able opinion, rendered in the case of the Milne Asylums.

The General Assembly of this State took the same view of the subject in 1825, in authorizing the parishes of Point Coupée and West Baton Rouge, to accept the legacies of *Julien Poydras*, to endow indigent young girls of those parishes with marriage portions. The parishes had no capacity to receive the donations, at the death of the testator. They were trusts, so much denounced in this case. They were perpetual trusts, the interest alone of the donations to be appropriated to the wishes of the donor. The General Assembly authorized the parish of Point Coupée to accept his donation, to establish an academy. Avarice has never suggested the idea of contesting the noble bequests of *Poydras*. The present situation of his donations differs in no respect from the situation of *Franklin's* bequest, except, that the police jury of Point Coupée are its administrators by authority of the State of Louisiana ; the magistrates of Sumner county are the administrators of *Franklin's* bequest, by authority of the State of Tennessee.

So, our Legislature gave powers, by special act, to the city of New Orleans, to accept the bequest of *Stephen Girard* to this city. Powers which, no doubt, the city possessed before, but, as doubts had been suggested to render assurance doubly sure, they were conferred by a special act, thus sanctioning the principle that legacies in favor of corporations do not lapse by the incapacity of the corporation to receive at the death of the testator ; but, that the incapacity might be removed retroactively by the sovereign.

The General Assembly of Pennsylvania took the same view of this subject, by enacting a law, immediately after the opening of the will of *Stephen Girard*,

SUCCESSION OF
FRANKLIN.

that "it shall be lawful for the mayor, aldermen, and citizens of Philadelphia, to exercise all such jurisdiction, enact all such ordinances, and to do and execute all such acts and things whatever, as may be necessary and convenient for the full and entire acceptance, execution, and prosecution of all the devises, bequests, trusts, and provisions, contained in said will." Judge Story drew up the decision of the Supreme Court of the United States, sanctioning the clause in the will establishing the Girard College. On account of his preconceived views, expressed in his dissenting opinion, in the case of the Sailors' Snugharbor, he presented this act in support of the will, only as "a legislative exposition and confirmation of the competency of the corporation to take the property and establish the college." But, if it had become necessary, in support of the bequest, to rely upon the act of the General Assembly alone, I have no more doubt than of my existence, that the Supreme Court of the United States would, as in the case of the Sailors' Snugharbor, have sanctioned the acceptance and execution of the bequest by the city of Philadelphia, under this act of the Legislature alone.

As Judge Story left the matter, the legislative action of a State must have great weight, for I see no difference between the legislative and judicial interpretation of laws and sanction of principles, except in their merit. Each must recommend itself by its intrinsic merit, to the intelligence and reason of man, to command respect and confidence.

In conformity to the principles established in all these cases, the State of Tennessee, being advised of the munificent bequest of one who was born within her limits, to establish a seminary of learning at the place of his nativity, has done all she could to avail herself of that munificence, by incorporating the seminary under the name of "The Isaac Franklin Institute." She gave the corporation, the trustees and superintendents, ample powers to carry out the will of *Franklin.* And, in the preamble to the act, exhibited a remarkable deference to the laws of Louisiana, and the opinions and action of her courts, whatever they might be, and evidently recommended full justice to all interested, and the settlement of all their controversies by compromise.

As the State of New York gave full powers to the trustees of the Sailors' Snugharbor, to carry out the bequest of its founder; and the States of Pennsylvania and Louisiana, to the citizens of Philadelphia and New Orleans, to accept and carry out the will of *Stephen Girard;* and the State of Louisiana to the Milne Asylum to accept and carry out the will of their founder; and to the parishes of Pointe Coupée and West Baton Rouge to carry the noble bequests of *Julian Poydras* into effect, so the sovereign State of Tennessee might incorporate a literary institution, to be established within her limits, and give all the powers necessary to carry out the will of its founder. The fact that the bequest was made by a citizen of Louisiana, and that the largest portion of the property is situated in this State, can make no difference in the eyes of liberal minded men. It can make no difference in the eye of the law, because our code has made no distinction between another State and our own, and foreign and domestic corporations, in this respect.

If the institution had been established in West Feliciana, it would have been maintained, under the decision in favor of the Milne Asylums. Is it to be destroyed because established in a sister State? It is impossible, without an imperative legal prohibition against it.

As already stated, it became necessary, for the widow and heir of *Franklin,* to succeed in this suit, for their counsel to overthrow the solemn opinion of our Supreme Court, in the case of Milne Asylums, guaranteed by the great

decision of the Supreme Court of the United States, in the case of the Sailors' Snugharbor, and, by what was done, rather than said, by that court, as to the Girard College. And feeling this, the counsel have boldly attacked that decision as a violation of our laws. They have not succeeded, in my opinion. The Milne Asylums, the Sailors' Snugharbor and the Girard College, remain noble monuments, not only of the munificence of their founders, but of the legislative and judicial wisdom which maintained and carried into effect the benevolent dispositions of their donors. And it is to be hoped, that The Isaac Franklin Institute will remain, during the five hundred years for which it is incorporated, an equally noble monument of wisdom, as well as of benevolence.

It is next contended, that the will of *Isaac Franklin* contains a substitution and a *fidei commissum*, which are prohibited by the 1507th article of the Civil Code. The article is in these words: "Substitutions and *fidei commissa* are, and remain, prohibited. Every disposition by which the donee, the heir, or legatee is charged to preserve for or return a thing to a third person, is null, even with regard to the donee, the substituted heir, or the legatee. In consequence of this article, the trebellianic portion of. the civil law is no longer a part of our law."

The authorities quoted in argument, satisfy me that there is no substitution in *Franklin's* will. To constitute a substitution, the donee must be charged to preserve the property until his death, and then return it to the substituted heir or legatee. The substitution supposed in this will is, that *Franklin* gave the third of his property to his brothers, and charged them to preserve and return it to their heirs. I am of opinion that he did not give the property to his brothers or their heirs, but merely appointed them, as trustees, to take charge of and administer it for the seminary of learning in Tennessee. The testator never contemplated, the brothers never construed the will as conveying any right of property to them. The manifest meaning and intent of the whole bequest is, that they, with the magistrates of Sumner county, should manage and superintend the property for the institution, without any beneficial interest in it themselves. This does not constitute a substitution : a term which embraces the ownership, and not the administration of property, and implies that one should hold the property for another during life, and transmit it to him at his death, and is very similar in its effects to the entail of the English law.

A *fidei commissum* is created when property is given to one for another, to vest in the latter, immediately at a given period or upon a condition. I do not think the will contains a *fidei commissum*, because the property was not given by *Franklin* to his brothers, for the literary institution, but was given to the institution itself; and that the title remained in the succession of *Franklin* until the seminary was incorporated.

But, if it be conceded that the title to the property was given to the brothers, for the literary institution, and was to be transmitted only when the institution was created and rendered capable of receiving, a *fidei commissum* was perhaps created, but, in my opinion, one not prohibited by law.

I have long entertained the opinion, that the article 1507 of our Civil Code, when adopted in the Code of 1808, was not intended to introduce new principles of law into Louisiana, but merely recognized the existing law at the time; and that no other than substitutions and *fidei commissa*, previously unlawful, were prohibited by it. The argument of this and other causes, lately, have confirmed me in this opinion.

SUCCESSION OF      The digest prepared in 1808, was adopted as a digest of the civil laws then in force
FRANKLIN.      in the Territory of Orleans, with alterations and amendments adapted to its present
system of government.   The digest did not purport to make any amendment of
the law in relation to substitutions and *fidei commissa*, and none flowed from the
new system of government in Louisiana.   The terms of the article indicate,
that the jurisconsults were adopting, not altering, the existing laws.

The words of the code are, " substitutions and *fidei commissa* are, and remain
prohibited ;" equivalent to saying, we declare what is, and shall remain, the law
on these subjects, not that they are hereby prohibited.   Now, what substitu-
tions and *fidei commissa* were prohibited, by the laws, anterior to 1808?   It has
often been decided, that the laws of Spain were in force in Louisiana at that
period.   The laws of Spain on the subject of substitutions and *fidei commissa*,
are summed up in Filreno, part. 1. c. 1, § 3, as follows:

" *Fidei commissary* substitutions have come to us from the Roman law.   At
Rome they were not held obligatory till a period much posterior to the establish-
ment of the republic.   All depended on a principle of good faith and probity.
The order of successions and testaments being fixed by the laws, testators
sought a means of leaving their property to proscribed persons, to exiles, to
unmarried men, and other persons who could not inherit.   Instituting legal
heirs in their wills, they charged such heirs to restore, or deliver up their
property to these persons.   But it happened frequently that the fiduciary heirs
appropriated the estate, or kept it back longer than the testator had ordered, or
that others were unwilling to accept or enter upon the inheritance, in order to
free themselves from the responsibility which brought with it no utility ; and
thence it resulted that *fidei commissa*, and all the remaining dispositions in the
will, failed, to the prejudice of the true heirs and the legatees.   Under these
circumstances, Augustus ordered that the consuls should take *fidei commissa*
into consideration.   A prætor was created to try the lawsuits which arose on
this subject.   Various senatus-consults were made to restrain and remedy the
abuses which had crept in, and as they did not produce the desired effect, it was
thought expedient to give an interest to the fiduciaries.   For this, was made the
trebellian senatus-consult, thus called from its author Trebellius, the Consul, by
which the fiduciary could retain the fourth part of the inheritance, but dividing
the actions and the charges with the *fidei commissary* in proportion to the share
of each."

I am satisfied the jurisconsult, who penned the article 1507 of our code, had
this section of Filreno before him, from the remark in the article itself, that in
consequence of this article, the trebellianic portion of the civil law, is no longer
a part of our law ; which remark was not in the article of the Napoleon Code,
which he copied.

Now, the *fidei commissiary* substitutions and *fidei commissa* thus ennumer-
ated and explained by Filreno, were thus disposed of by ordinance of Charles the
III, in May, 1789.

" Considering the evils which flow from the facility which has existed of
entailing estates forever, by an abuse of the permission granted by the laws to
that effect, whereby idleness and pride, are promoted in the possessors of small
entailed estates, and in their children and relations, which deprives the army,
navy, commerce, the arts and trades of their services, I have resolved, that,
henceforth, no one can found an entail, nor prohibit forever the alienation of his
estates for that purpose, without obtaining my previous permission, * * * and

the contrary is only permitted in the case of great public utility." Novis. Recop. lib. 10, tit. 17, Law 12.

It was, therefore, substitutions which changed the order of descents and fostered pride and laziness, and abstracted property from commerce, and *fidei commissa*, by which one held property for another who was incapable of receiving, or for an unlawful purpose, which were prohibited by the laws of Spain, in force in 1808, and which the jurisconsults who framed the code, declared are and remain prohibited.

It has been supposed, however, that the jurisconsult who penned the article, referred to the laws of France, not only because he was born and reared under her jurisprudence, but because he adopted *verbatim*, the language of the Napoleon Code as to substitutions, and extended it to *fidei commissa*. If so, the result, in the present case, would be precisely the same. A substitution by the French and Spanish jurisprudence, is the same, and inapplicable by its exact definition to the will of *Franklin*. In France, *fidei commissa* were, and remain to this day, lawful for lawful purposes, and were reprobated only when used for an unlawful purpose. Now, the chapter of our code, in which the article under consideration is found, treated " of dispositions reprobated by law in donations *inter vivos* and *mortis causa*," not of donations which were not reprobated by law. The digest did not purport to establish new, but to publish existing reprobations in donations, and using in the article the terms of the Napoleon Code as to substitutions, all of which were prohibited, extended the prohibition, as expressed in the title of the chapter, to reprobated *fidei commissa*. The donation to one, to hold for another capable of receiving, for a useful and lawful object, and from good motives, was never reprobated by the French Code, or any other system of laws. Therefore, I am obliged to express the opinion, that our late Supreme Court fell into an error in the case of *Tournoir* v. *Tournoir*, 12 L. R. 23. And to conclude, that even if there was a *fidei commissum* in the bequest of *Franklin* to the seminary in Tennessee, as the object was lawful, and the trust created from good motives, it does not fall within the reprobated donation of which alone the chapter of the code so often cited, treats, and, therefore, is not a donation that falls.

From a full consideration, then, of the clause in the code abolishing *fidei commissa*, the time and circumstances under which it was adopted, and the title of the chapter in which it is inserted, I am of opinion, that the clause means, in the English language, nothing more than, that trusts for unlawful purposes are abolished, and thus truly interpreted, it is not only a harmless but wise provision of law.

But I have seen so much litigation growing out of this enactment substantially in the Latin language, so much perversion of right and restraint of the innocent wishes of men as to the disposition of their property, that I shall hereafter entirely disregard it, as having been inserted in our code of 1825, in violation of a clause in the old and present Constitution, requiring the laws to be published in the English language. In my opinion, the constant resort to foreign jurisprudence, in languages dead or alive, for the government of our State, produces a baneful effect, and was intended to be restrained by the Act of 1828, which abrogates all civil laws which were in force before the promulgation of the Code of 1825. They are to be looked to merely as a means of elucidation, where there is no written law. But in such cases, there is an express rule prescribed by the 21st article of the code. The judge is bound to

SUCCESSION OF FRANKLIN.

proceed and decide according to equity and established usages. In so deciding, I will, never impose any restraint upon the munificent and noble disposition of men's property, where I find no restraint imposed by the code or statutes.

The view I have taken of the articles 1506 and 1507, prohibiting dispositions reprobated by law, and substitutions and *fidei commissa*, shows that they can have no effect upon *Franklin's* bequest. They prohibit the perpetuation of property, by will, in persons, beyond one life, to preserve the order of legal inheritance; they prohibit trusts for unlawful purposes, and no other trusts. The laws of France, Spain, and of our own code, quoted on these subjects, refer exclusively to natural persons, and have no relation whatsoever, to bequests for the establishment of institutions of public utility. These could be founded and permanently established in France and Spain, from whence we derive the articles of our code. There was no prohibition to the contrary in those countries. And so far from there being a prohibition in our code against similar donations, they are recognized in the most general manner, by article 1536 of the code. "Donations made for the benefit of an hospital, of the poor of a community, or of establishments of public utility, shall be accepted by the administrators of such communities or establishments." If there be no administrators, as is the case with an establishment founded by the testator, it is for him to appoint them or direct the mode of appointment, because no law forbids it. Or, he may defer to the Legislature the mode of their appointment, by an act of incorporation. As establishments of public utility are in general intended to be perpetual from their nature, so donations, made in order to found them, are generally made perpetual in their charter. The property bequeathed may be, and generally is, converted into a perpetual fund to support the establishments by its revenues.

There is no law which forbids the perpetuity of establishments of public utility, and no policy adverse to them, nor any law which forbids the perpetual endowments of such establishments. So far, there has not been, in this State, the perpetual destination of property to such establishments, by will, to such an extent as to create the least detriment to commerce or restraint upon alienations, injurious to the public.

I doubt if that will ever be the case in this State, where property thus destined by some, is soon, by waste, extravagance and unfaithfulness, *again thrown* back into commerce and speculation. When evils shall arise from the accumulation of inalienable property, by its destination to establishments of public utility, the sovereign Legislature to whom it rightfully belongs, will afford the remedy. Courts are not to usurp, without law, the business of remedying or preventing the evils which are yet at least only imaginary.

Trustees or other administrators of these institutions, must accept, hold in trust, and administer these donations for the institutions. These institutions are corporations, and can only act by trustees, directors, administrators or others. By them they are expressly authorized to act by the 429th article of our code. They are likened to minors, by the French commentators. Others, from necessity, must act for them. And after all, this system of trusts, frightful only in imagination, amounts to this, that the property is in reality given to persons incapable, not of receiving, but of administering the property; and trustees are appointed who have the power of administering it for the incapable owner, and nothing more. And the system must, from the nature of the case, exist as to

all institutions of public utility and in all countries. Our system of laws is full of trusts. Executors are trustees; syndics are trustees; curators and tutors are trustees. The directors of assylums and all charitable institutions, are trustees of all the donations daily made to them. The list of such trusts, might be multiplied almost indefinitely. And I know of no restraint upon them, except when they are reprobated by law.

I come now to apply these principles to the controverted bequest in *Franklin's* will. He gave one-third of his estate to establish an academy or seminary of learning in Sumner county, in the State of Tennessee, for the purpose of giving his descendants, and the descendants of his collateral relations, and the poor children of the county, a substantial and good English education, and such other and higher and ornamental branches, as the revenues of the bequest would enable his trustees to accomplish.

The establishment of a seminary for education, in a sister State endeared to us by so many recollections of common sacrifices and brilliant achievements; connected with us by a commerce so highly beneficial to both, and by a constant intercourse which renders us so homogeneous in character, must be regarded by all our citizens as an establishment of public utility.

It was said in argument, that the bequest was an attempt of the testator to gratify his pride, by establishing a kind of aristocracy in his family. The few relics of his character left in the record, will scarcely justify the remark on behalf of his widow and child. If he had devoted the seminary to attract around it only the descendants of his blood relations, for the purpose of enjoying its advantages, the only aristocracy it conferred was, to receive the best of all legacies, in the language of the will, a substantial and good English education. But, it will be seen by the will, that his munificence extended to all the poor children of his native county, of unexceptionable character. Having acquired great wealth, by his own exertions, by industry, economy and good fortune, when, by will, he undertook to make the best disposition of it, in prospect of death, after providing môst magnificently for his own immediate household, he turned his thoughts to those connected with him by blood, and to his native county, remembered its poor, and provided an establishment in which they could receive the greatest blessing of life, a good and substantial English education. This must be, in the language of our code, an establishment of public utility, and forbidden by no law, human or divine.

He gave the property to the institution. No other interpretation can reasonably be given to the terms of the bequest. And we are bound by law to interpret it so as to give it effect, and not to annul it. The trustees and magistrates of the county were appointed, merely to administer and manage it for an institution, which could not do so. The children were the donees, until the institution was incorporated. The children could neither receive nor administer the property. And yet, they could take the bequests, indefinite as they were. It was so decided by our late Supreme Court, in the *Succession of J. C. Mavy*, 2 R. R. 440, as to a bequest to the poor of New Orleans. And whoever wishes to see all the decisions settling the jurisprudence on this subject, are referred to the great argument of Mr. Binney, for the city of Philadelphia, in the contest as to Mr. Girard's will.

Suppose, however, we consider the question in the point of view the appellee's counsel contend it aught to be considered, what will be the legal result? As to the great and leading object of *Isaac Franklin*, there can be no doubt: it was

SUCCESSION OF
FRANKLIN.

to found an institution for the education, not only of the children of his own relations, but of all the children, so far as the means provided would admit, of his native county. That this object was legal, and highly laudable, cannot be disputed. The inquiry, then, arises, whether there is anything illegal or contrary to public policy, in the means by which *Franklin* sought to accomplish that object?

Now, if he did convey the title to the property destined for the endowment and support of the seminary, to his brothers, *William* and *James Franklin,* they were only the instruments through whose agency the seminary was to be established and administered, until the Legislature of Tennessee should pass the necessary acts incorporating the seminary, and providing for its administration. This, then, is a trust, uncoupled with an interest, vested in two persons, for the purpose of accomplishing a lawful object, as soon after the testator's death as, in the nature of things, it could be done. Is such a trust void, as prohibited by law, or repugnant to public policy? The question presents precisely the case of *Mathurin* v. *Livaudais,* in which the decision of our Supreme Court, in favor of the trust, has always been approved. It is a trust, uncoupled with an interest, valid by the settled jurisprudence of our State since that decision ; and, therefore, if even a *fidei commissum,* tolerated and permitted by our laws, like many others, where the end to be obtained by them was legal and laudable.

The dispositions of the will being lawful, it is the imperative duty of the courts to carry them into effect, even if the mode of doing so, directed by the testator, should fail or be unlawful, as in the case of *Clague's Widow* v. *His Executors,* 13 L. R. 7.

What law of Louisiana prevents us from adopting the reasonable rule of Lord Talbot, in *Hopkins* v. *Hopkins,* that, in such cases, the method of the courts is, not to set aside the intent, because it cannot take effect so fully as the testator desired, but to let it work as far as it can; or, of the Master of the Rolls, in *Frelluson* v. *Woodward,* that if the court can see a general intention, consistent with the rules of law, but the testator has attempted to carry it into effect in a way that is not permitted, the court is to give effect to the general intention, though the particular mode shall fail. 4 Vesy, Jr. 329. 1 Pierre Williams, 332. 2 Brown's Chan. 51.

The modes of carrying the will into effect, are mere incidents to the will, and do not affect its substantial and valid dispositions. If the modes prescribed for carrying them into effect are impossible or contrary to law, they are reputed not written, (Art. 1056,) and the courts will cause them to be executed by other means. The executors are bound to see the will faithfully executed, as long as they live, unless discharged ; and in that case, if necessary, the courts will appoint dative executors. Though I by no means consider it necessary or proper, in the present case, to annul the invaluable dispositions in this will, because the forms prescribed for carrying them into effect may be considered objectionable ; it would be the sacrifice of an object of great public utility to immaterial forms, which can never be done, except, by what too often occurs, the sacrifice of public rights to individual interest.

The perpetuity of the donation, however, is made a serious objection to its validity. It is said, the revenues alone of the property bequeathed to the institution, are destined to its support for five hundred years ; that this takes the property itself out of commerce, and renders it inalienable, to the great injury of the State of Louisiana.

There is no express prohibition of the alienation of the property, but as the will directs the institution to be supported out of the revenues, and as the object, the support of a seminary of learning, is from its nature intended to be perpetual, it was no doubt the wish of the donor that the property should remain inalienable. I find no law of our State opposed to the inalienability of property, destined by its revenues to support an institution of public utility, intended from its nature to be perpetual. And all good policy indicates, that such property should be inalienable to prevent the waste, extravagance and exposure to total loss, by being converted into money. There is, and always will be, plantations and property enough for sale in Louisiana, without forcing into the market the very few that will ever be destined, by their revenues, to the support of establishments of public utility. The equal distribution of estates among children and other heirs, by our laws, and many other causes which it is unnecessary to detail, will forever prevent the burdensome accumulation of estates or their inalienability to an extent at all injurious to the State ; and when that occurs, the sovereign State may direct the alienation of the property, and prohibit its inalienability in future. At present, perhaps, a greater evil consists in the constant changes of estates, so as to counteract, in some degree, their permanent improvement and increased productiveness.

It is asked, can the sovereign State of Tennessee directly, or by a corporation of her own creation, be permitted to hold and administer estates in Louisiana, the revenues of which alone are to be expended ? Certainly ! because there is no law of this State prohibiting a sovereign State from receiving a legacy from a citizen of Louisiana, nor a corporation created by that State ; nor, in my opinion, any policy of our State opposed to it.

The idea has been much urged, that our code prescribes certain rights of property, and can recognize no others at the will of individuals. There is ownership perfect and imperfect, the right of usufruct, use and servitude. In my opinion, but a single right of property is established by *Franklin's* will, and that is ownership in favor of his seminary. His intention is clear to give the property to the seminary, but its revenues alone are to be used. This restriction is but a mode of administration, which he had a right to impose on the institution he founded, and is not a modification of the title to the property. He had the right to impose it, because the institution is to be likened to a minor, incapable of selling his property, or of even administering it, but entitled to its revenues for his support. He is the owner of his property, but, from minority, disabled from administering, much less from selling it. The Franklin Institute was created with the same disabilities, which the founder imposed on account of its assimilation to a minor.

There can be no objection to this mode of administration, because it is almost universally adopted as to the endowment of institutions, and because no law or policy of the State forbids it. Usage, in default of express law, fully justifies it, as prescribed by article 21 of the Civil Code.

If the revenues were to be received by another person than the owner, it would constitute a kind of usufruct. But as the revenues are to be enjoyed by the owner, the ownership is perfect, and there is neither usufruct nor servitude. If a restraint upon alienation had been established, that would have affected the administration, not the ownership of the property. Such restraint is highly useful in the foundation of charities, or the endowment of institutions for education, to prevent waste, extravagance and even total loss; but they relate to the administration and destination, not the ownership of the property, and may be always changed by the sovereign power of the State.

SUCCESSION OF
FRANKLIN.

The destination of the interest of the city, for example, in its waterworks, does not affect its ownership of that interest. The destination of its ground-rents to particular objects, of the revenues of its markets to a sinking fund to extinguish loans, based upon their faith, renders the property inalienable, but does not destroy the ownership of the city, because it affects the administration, not the title of the property. To apply these observations to the present case, the property is to be administered for the institution, in such a manner that the capital shall be preserved, and the revenues only expended for the support of the Franklin Institute. The trustees of the property are, therefore, merely administrators for the owners of the property, and limited to the expenditure of its revenues.

These principles might be illustrated by reference to the Roman distinction and definitions of property, the *jus fruendi*, the *jus utendi* and the *jus abutendi*, but they are more easily understood by all in the English language, and, therefore, the reference on my part, at least, would be but useless pedantry.

If, however, such ownership or administration, as is created by this will, becomes burdensome to our State, or adverse to our interest, it is always competent to our sovereign State to direct it to cease, as there is no express prohibition in the will to alienate the property ; and our Legislature might direct the alienation of the property, at any time, without violating even the terms of the will.

I feel it an imperative duty of the office I hold, to guard, with all possible strictness, the conjections of all wills, except in the olographic form, on account of the horrid impositions which have been practiced upon men in *articulo mortis*, under the pretext of wills.

But when it is ascertained, beyond a doubt, that a man has made a will, it is a more imperative duty, in my opinion, to carry it into full and entire effect, unless forbidden by express law. And, in doing so, I will not regard much the whole policy of the law, terms of very different meanings, in the minds of different men. As in the case of the great bequest of *Stephen Girard*, it was contended, with apparent sincerity, by the ablest counsellors in the Union, elevated above the mere influence of fees, that the liberal principle of the testator, excluding religious proselytism from his college, was not only against the whole policy of human laws, but a direct violation of Divine legislation.

Upon the whole case, I think every clause of the testament of *Isaac Franklin* can legally, and ought to be carried into full and entire effect. And, especially, that the great monument of wisdom and benevolence which he attempted to erect, should be left to perpetuate his memory, since, in my opinion, neither our laws nor any motives of public policy exist for crumbling it to the dust.